**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| 84 LUMBER COMPANY, L.P. | ) | |
| | ) | Civil Action No. 11-548 |
| Plaintiff/Counter-Defendant | ) | |
| | ) | Magistrate Judge Lisa Pupo |
| v. | ) | Lenihan |
| | ) | |
| GREGORY MORTIMER BUILDERS, | ) | |
| *et al.* | ) | |
| Defendants/Counter-Plaintiffs | ) | |


## MEMORANDUM OPINION ON THE PARTIES' MULTIPLE MOTIONS
## AND CROSS-MOTIONS FOR SUMMARY JUDGMENT


### I.  SUMMATION

The August 10, 2015 Motion for Partial Summary Judgment as to Tort Claims and

Punitive Damages ("Plaintiff's MPSJ") (ECF No. 145) filed by 84 Lumber Company, L.P.

(hereafter "84 Lumber" or the nominal "Plaintiff") will be granted only as to (a) Count II,

negligent misrepresentation *only as brought by* Defendant M&M Development, LLC a non-

party to the 1997 Commercial Credit Agreement;  (b) Count III, fraudulent/intentional

misrepresentation related to Plaintiff's defective/negligent construction and/or failure to

repair/replace under  Subcontractor Agreements, *only as brought by the non-individual*

*Defendants*; and (c) Defendants' claim(s) for any entitlement to punitive damages.  The

remainder of said Motion: Count I - fraud in the inducement as brought only by Defendant

Gregory Mortimer (hereafter "Mortimer"); Count II – negligent misrepresentation as also

brought by Mortimer and Defendant Gregory Mortimer Builders, designated as parties to the 1997 Commercial Credit Agreement in Plaintiff's Complaint;[1] and Count III – fraudulent/intentional misrepresentation as also brought by Mortimer, party to the Subcontractor Agreement) will be denied due to the existence of material fact questions. The Court further concludes that Plaintiff's somewhat overlapping August 10, 2105 Motion for Summary Judgment as to Damages ("Plaintiff's Damages Motion") (ECF No. 144) will be denied for the same reason, *i.e.*, material fact questions. As to the punitive damages portion, to the extent it overlaps with ECF No. 145, and was granted, it will be dismissed as moot.

The September 11, 2015 Defendants' Cross-Motion for Partial Summary Judgment ("Defendants' Cross-Motion for PSJ") (ECF No. 151) filed by Gregory Mortimer Builders, *et al*. (hereafter individually "GMB", and collectively "the Mortimer Entities" or the nominal "Defendants") but limited to summary judgment on Plaintiff Mortimer's individual contract claims, Counts IV through IX of the Second Amended Counterclaim (ECF No. 44), will be denied due to the existence of material fact questions. The Court further concludes that Defendant's Motion for Partial Summary Judgment of the same date ("Defendants' MPSJ") (ECF No. 149) which, despite its caption, seeks "dismissal of all counts contained in 84 Lumber's Complaint" will be granted as to dismissal of Count IV, Unjust Enrichment, in the alternative, against Defendant Mortimer as Guarantor and clear party to any underlying contracts, but denied as to all other counts due to the existence of questions of material fact.


## II.     RELEVANT FACTUAL AND PROCEDURAL HISTORY

---

[1] See *infra*, n. 4. Cf. Second Amended Counterclaim (ECF No. 44) at Count IX (breach of contract claim as to Commercial Credit Agreement brought by Mortimer).

The extensively documented factual and legal history in this now almost five (5) year old case arising from disputes between the parties with regard to (a) construction material purchases and (b) sub-contracted construction of housing in Defendants' two multi-duplex residential developments – Timberlake Village (hereafter "Timberlake") and Cedar Creek[2] – located near Deep Creek Lake, in Garrett County, Maryland entails the following:

## Contractual and Factual History

The record before this Court, which contains multiple submissions of the 84 Lumber form contract documents at issue, indicates (despite the parties' varyingly inconsistent representations, particularly as to 84 Lumber, regarding their written contracts and terms and parties):

Mortimer was the signatory party to an 84 Lumber Commercial Credit Application form dated May 9, 1997 (the "1997 CCA"). The Court notes that Gregory Mortimer executed this document, with a box check for Proprietorship, as designated "Owner, Partner or Corporate Officer" of an unnamed "General Contractor Business" begun in 1994 and that the signatory language certifies that he is the "principal of the above business and [did] personally guarantee . . . payment of any *sums due by the above named business*". See, *e.g.*, ECF No. 12, Ex. 1 (emphasis added).[3] The front/signature page of the 1997 CCA indicates that it contains the

---

[2] As noted in Plaintiff's Damages Motion, ECF No. 144, a Defendants' expert report includes asserted/calculated damages related to, *e.g.*, bank foreclosure(s) at Defendants' Mystic Creek development. See discussion of damage allegations and parties' litigation conduct generally, *infra*.

[3] The Court further notes that 84 Lumber's April 4, 2011 Complaint in this matter was filed against Gregory Mortimer Builders as "Defendant" and Mortimer as "Guarantor". The Complaint asserts, in Count I against GMB for breach of the CCA, that said Defendant completed the CCA, and an agreement was formed between it and 84 Lumber for the purchase and delivery of goods, which GMB breached by non-payment. The Complaint asserts, in Count II against Mortimer as Guarantor, breach of his personal guarantee of "[GMB's] obligations under the [CCA]". Counts III and IV are claims against GMB and Mortimer, respectively, for

agreed upon terms and conditions on its reverse side and that the signatory is certifying he has read, understood and agreed to the same. The relevant provisions include an 18% per annum finance charge on past due amounts, the applicant's liability for "attorneys fees and costs for all mechanic's liens filed",[4] disclaimers as to applicability of consumer transaction laws and warranties of merchantability or fitness for purpose of the materials; and more significantly, 84 Lumber's right to "change the terms and conditions of said account upon written notice to Applicant from the Credit Manager of 84" (paragraph 6). Under paragraph 11: "This Instrument embodies the entire Contract – Commercial Terms and Credit Agreement of 84. There are no other promises, terms, conditions or obligations, other than those contained herein. 84's Contractor – Commercial Terms and Credit Agreement may not be modified or altered except in accordance with the provisions of paragraph 6 . . . ." See id.[5] The Court notes this form document contains no choice of law provisions. Mortimer disputes the receipt and authenticity of these reverse-side terms and conditions. See, e.g., Defendants' June 16, 2011 Response in Opposition to 84 Lumber's Motion to Dismiss ("Defendants' Response in Opposition to MD") (ECF No. 14). Cf. language of signature page referencing Mortimer's certification as to terms and conditions, noted supra; Plaintiff's Motion to Exclude Report and Testimony of J. Wright

---

[4] The Court notes the facial ambiguity of this language, the doctrine of construction against the drafter, and Plaintiff's subsequent revision of its attorneys' fee provisions in the 2009 CCA of record. Compare Plaintiff's repeated pleading assertions of its unambiguous entitlement to, e.g., attorneys' fees related to amounts owing for construction materials sold to Defendants.

unjust enrichment by "goods and supplies" allegedly provided to each. See ECF No. 1, Ex. A. Compare record factual statements and litigation positions by parties with regard to contractual relationships. In other words, the parties' contractual/historical course of dealings – and indeed their course of litigation as well – reflects a degree of inexactitude and inconsistency that now significantly contributes to the material fact questions with which this litigation is rife.

[5] The Court observes the clearly limited effect of the 1997 CCA's brief integration provision and, in particular, that it is not – nor could it be - prospective.

Leonard (ECF No. 93) (expert report regarding apparently faxed page of self-carbon CCA form pack and other aspects of 1997 CCA exhibits).

Defendants allege that during the 2007 tenure of a Garrett County, Maryland store manager subsequently discharged for fraud, 84 Lumber defrauded Defendants on materials purchased for the construction of a residence by, *e.g.*, charging for materials never provided or delivered, overcharging for materials or substituting lesser grade materials for those charged. See, *e.g.*, Second Amended Counterclaim (ECF No. 44). The record indicates that Mortimer and 84 Lumber entered into a confidential settlement agreement whereby Mortimer released 84 Lumber from liability arising prior to October, 2007. See id.*;* Plaintiff's June 29, 2011 Reply Brief in Support of Motion to Dismiss Portions of Defendants' Counterclaim ("Plaintiff's Reply Brief in Support of MDPC") (ECF No. 16). Mortimer asserts that at the time of the October, 2007 settlement, 84 Lumber represented that there were and would be no other improper charges to the account, and that business with Plaintiff – including construction material purchases - was continued in reliance on these representations.[6]

84 Lumber also provides to the litigation record its subsequent January 23, 2009 Credit Department correspondence addressed to Mortimer individually and serving as notice of modification of the terms and conditions of the CCA which assertedly "will take effect thirty (30) days after the date of this letter" and be deemed accepted absent written objection by certified mail within thirty days. The substantially lengthier terms of this document (the "2009

---

[6] The Court observes that statements which constitute promises of future performance differ from those which constitute representations of existing fact. See discussion, *infra*, e.g. fn.13; Section IV.C.

CCA")[7] contain new provisions, including, *e.g.*, that "customer" and party/parties references now expressly include both the account holder and any guarantors; and – in paragraph 8 - that as to its retained right to change terms and conditions, 84 "will give Customer notice . . . as required by the applicable law by sending notice to Customer's last known address . . . . Changed terms and conditions will apply to any outstanding balance of the account as well as to any transactions after the date of the change. In any event, Customer's failure to object . . . will confirm that Customer agrees to any such change."[8] See, *e.g.*, ECF No. 12, Ex. 1. Paragraph 9 restates 84 Lumbers' right to attorney's fees, now providing that if the account is placed for collection or 84 Lumber seeks recourse of any kind for non-payment "Customer agrees to pay 84 reasonable attorney's fees and costs, including fees and costs for mechanic's liens." The new integration clause of paragraph 12 provides:[9]

---

[7] The Court observes that despite the correspondence date, and Plaintiff-drafted content, Plaintiff refers to this document as the "2008 Credit Agreement" and maintains its applicability to the April-October, 2008 Subcontractor Agreements at issue.

[8] The Court notes that the provisions of new paragraph 8 (*e.g.*, applicability to outstanding balances as well as later transactions) are facially applicable to *further changed terms and conditions noticed subsequent to the effective date of the January 23, 2009 modification*.

[9] The Court notes, as to new paragraph 12 of the January 2009 CCA, which Plaintiff asserts was effectively integrated into the April-October 2008 Subcontractor Agreements, that if read as intended to apply outside the CCA materials purchase context, it would either have (a) been a patent misstatement of the parties' then-contractual relationships (*e.g.*, there were other written understandings, *i,e.*, the Subcontractor Agreements) or (b) purportedly effected a vitiation of those relationships. The Court further notes that the later language of this paragraph, expressly pertaining the CCA's integration clause to "purchase orders, contracts or other similar documents" provides support for interpretation of its provisions – consistent with existence of the parties' Subcontractor Agreements – as (a) integrating understandings, *etc.*, and (b) providing controlling terms as to, *material purchases*. Again, even crediting the possible applicability of this CCA to the Subcontract Agreements, inexactitudes in business dealings and document drafting create extensive material fact questions.

The entire agreement of the parties is set forth in this written document and there are no other oral or written understandings, promises, representations or agreements. This agreement cannot be modified or amended except that 84 may change the terms and conditions of this Agreement as set forth in Paragraph 8, above; and this Agreement shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties hereto. This Agreement shall take precedence, supersede and control over any conflicting or additional terms contained in purchase orders, contracts or other similar documents issued or executed by the parties and no such documents shall be binding upon 84 unless approved and signed by an authorized officer of 84 . . . .

The new limitations of liability, contained in paragraph 14, provide – in addition to disclaimer of warranties of merchantability or fitness for purpose, now revised to include "building materials or installation purchased by Customer" – that "[i]n no event shall 84 be liable for liquidated, incidental, punitive or consequential damages in connection with building materials or installation purchased by Customer" or "shall 84's liability exceed the replacement cost of building materials or installation." New choice of law, consent to jurisdiction and forum selection provisions in paragraphs 15 and 16 designate Pennsylvania law and specified Courts, respectively. [10] Paragraph 17 contains a customer waiver of right to jury trial "on any matters arising out of or relation to this Agreement, or any transactions contemplated hereby" and paragraph 19 contains the customer's agreement not to withhold/setoff/deduct/retain payments due on the account. Defendants disavow receipt and applicability of the 2009 CCA. See, *e.g.,*

---

[10] Paragraph 15 provides that "*This Agreement* shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." (emphasis added) The Court expressly notes the self-referential nature of this provision of the 2009 CCA as drafted by Plaintiff.

Defendants' July 8, 2011 Surreply Brief in Opposition to 84 Lumber's Motion to Dismiss ("Defendant's Reply in Opposition to MD") (ECF No. 17).[11]

In addition to the documentation detailed above, Mortimer (as contractor) and 84 Lumber (as subcontractor) were the signatory parties to 84 Lumber "Subcontractor Agreement/Scope of Work" forms (the "Subcontractor Agreements") for the installation of purchased materials at five (5) development projects - three (3) at Timberlake (buildings 8, 11 and 12)[12] and (2) at Cedar

---

[11] 84 Lumber asserts that the 2009 CCA governs all the parties' contractual relationships and that its new and additional provisions apply. See, e.g., Plaintiff's June 29, 2011 Reply Brief in Support of Motion to Dismiss Portions of Defendants' Counterclaim ("Plaintiff's Reply Brief in Support of MDPC") (ECF No. 16) ("[T]he terms and conditions in effect at the time of the execution of the 2008 Subcontractor Agreements contained a clear, unambiguous Pennsylvania choice of law provision."). The Court notes the provisions of the 1997 CCA; the CCA's January, 2009 date, i.e., subsequent to Subcontractor Agreements; the material fact questions regarding receipt; and the existence of other potential questions of intent and interpretation of provisions, as well as their enforceability (as, e.g., depending on interpretation/intention that would be against public policy, such as prospective authorization of a future tort). Moreover, the Court notes that it need not on motions for summary judgment address the legal implication of numerous questionably applicable provisions, such as the 2009 CCA choice of law provisions. It observes as to choice of law and any potential applicability of, e.g., Pennsylvania's gist of the action doctrine or the States' jurisprudence as to parole evidence or the economic loss rule, the high probability that, in the circumstances that appear to the Court most supported by the record presently before it, the same results would obtain.

The Court also observes that absent a binding and applicable contractual agreement to Pennsylvania law, Maryland law applies under the factual circumstances which are undisputed. That is, under the choice of law rules of the forum state, Pennsylvania, even in the event this Court determined a true conflict, Maryland clearly has the greater interest in the application of its laws hereto. Cf. Defendants' Reply in Opposition to MD (ECF No. 17) (asserting that even if Pennsylvania choice of law provision applied to claims under the Subcontractor Agreements, it would not apply to, e.g., fraudulent inducement claims).

[12] Although one Subcontract Agreement designates building 10, the parties apparently agree this was erroneous and the Agreement was intended and performed at Timberlake building 8. See, e.g., Plaintiff's Damages Motion, ECF No. 144; Second Amended Counterclaim, ECF No. 44, Ex. 1. This is unfortunately a far from isolated example of inconsistencies in contract or litigation.

Creek (buildings 1 and 2). These Subcontractor Agreements were dated between April, 2008 (2 subcontracts) and October, 2008 (3 subcontracts). <u>See, e.g.,</u> ECF No. 12, Ex. 1.[13]

Each of these essentially identical Subcontractor Agreements provided that the work would be properly performed "per print and manufacturer specifications", with "competent supervision", and would "meet or exceed local building codes" and "pass all required inspections". <u>See, e.g.,</u> ECF No. 15, Ex. A. Paragraph 14 provided that the terms and conditions of "84 Lumber Company's Contractor-Commercial Credit Agreement", "a copy of which [Mortimer] hereby acknowledges receiving" were "incorporated herein by reference". <u>Id.</u>[14]

Subcontractor Agreement paragraph 15 contained 84 Lumber's "guarantee" that the work would conform to specifications, comply with laws, and be free from defects in workmanship

---

[13] Mortimer asserts, in support of Counts I and II of the Second Amended Counterclaim, that he was induced to continue doing business with Plaintiff and to enter into these construction subcontracts by 84 Lumbers' late-2007 and 2008 fraudulent representations (1) that 84 Lumber would assign residential construction crews that were part of its existing trained and experienced national corporate program; and (2) regarding the non-occurrence of additional fraudulent or excessive billings – including, as to the three October, 2008 Subcontractor Agreements, (a) factual representations regarding an audit assertedly conducted in August-September, 2008 after Plaintiff's employees advised Mortimer there had been further improper materials charges (<i>i.e.</i>, for purchases under the CCA) and (b) 84 Lumber's subsequent verbal representations and September 28, 2008 correspondence verifying that it had audited Defendants' account and there were no improper charges. <u>See, e.g.,</u> Defendants' Response in Opposition to MD (ECF No. 14); Second Amended Counterclaim (ECF No. 44). Thus, the allegations underlying these counts include both future performance promises and misrepresentations of present material fact, and relate to both the materials purchase and construction course of dealings.

[14] The Court observes that – rather significantly to this litigation - the Subcontractor Agreements make no more specific identification of which CCA Mortimer acknowledged receipt. <u>Compare, e.g.,</u> Plaintiff's election to omit inclusion of the contract language in its pleadings, and its repeated representations that the contracts referred to Plaintiff's "current" or "contemporaneous" CCA, asserted to be the 2009 CCA. <u>See, e.g.,</u> Plaintiff's Damages Motion (ECF No. 144) ("The SAs incorporate by specific reference the terms and conditions of the contemporaneous Credit Application."). <u>Cf.</u> Plaintiff's Reply Brief in Support of MDPC (ECF No. 16) (asserting that when Mortimer executed the Subcontractor Agreements "he expressly acknowledged receiving and reviewing the Terms and Conditions in effect at that time").

and materials.  Paragraph 15 limited 84 Lumber's "*liability hereunder*" (emphasis added) to the "extent of 84's negligence" and its obligations to "repair or replacement of any defective or nonconforming [w]ork."  Mortimer agreed that 84 Lumber was not liable "for any consequential, indirect, exemplary or punitive damages of any type *in connection with any claim under this paragraph*." (emphasis added)  And the guarantee expressly commenced "upon commencement of the [w]ork and [continued] for a period of one (1) years [*sic*] from the date of sale *with respect to defects in non-structural and structural materials sold* by 84." (emphasis added).[15]  The paragraph closes with a form language disclaimer of any further express or implied warranty, included warranty of merchantability or fitness for a particular purpose.  Id.

The remainder of each form Subcontractor Agreement provides specifications for each type of work undertaken which varies somewhat as to the particular construction projects and locations (*e.g.*, framing, decks, windows and doors, roofing, siding and exterior trim).[16]  Finally,

_____

[15] The Court notes the express limitation of the one-year-from-sale provision to *materials*, the business-practice implication that the contract language references a guarantee of materials from the date of their sale by 84 Lumber, and the absence of identification of a particular seller or other more express contractual language – the same being construed against the drafter.  The actual contract language is again at odds with Plaintiff's litigation conduct and choices made with regard to the content of its pleadings.  Compare, *e.g.*, Plaintiff's Damages Motion (ECF No. 144) (asserting that "the contracts limit the time for Defendants to bring claims for damage to a particular property to one (1) year from the last date [Mortimer individually] owned that property").  The Court must also note that Plaintiff's various pleading assertions regarding Mortimer's lack of standing/recourse with respect to his contractual payment/performance relationships with Plaintiff because of his business entities' structure and ownership interests are without basis.

[16] The Court observes that the only provision specifying particular qualifications of the subcontractor laborers appears with regarding to decking, which requires that all work "be performed by trained and experienced personnel".  Compare Defendants' allegations regarding, and misrepresentation claims based upon, Plaintiff's pre-contract key representations regarding the performance of all Subcontract Agreement work by expert/national construction employees (while the work was actually performed by "friends and family" of Plaintiff's local store

as Defendants' note, the Subcontractor Agreements differ slightly as to payment schedules.  See Defendants' Memorandum of Law in Support of Opposition ("Defendants' MLS of Opposition") (ECF No. 152).[17]  The Court notes that the form Subcontractor Agreements contain no other provisions as to, *e.g.*, integration, jurisdiction, choice of law, or limitations of liability (such as further time bars).

Defendants assert that Plaintiff materially breached each Subcontract Agreement by, *e.g.*, failing to install materials according to manufacturer's instructions and failing to conform to local building code; that Defendants received Correction Notices from the County Office of Buildings and Permits; and that Plaintiff made misrepresentations as to its work performance and failed/refused to make and made further misrepresentations regarding the requisite repairs to its work.[18]  Defendants also assert that Plaintiff made misrepresentations as to its August-September 2008 audit, and breached the 1997 Credit Agreement by improper overcharges subsequent to the October, 2007 settlement. See, *e.g.*, Defendants' MLS of Opposition (ECF No. 152).

---

[17] The three October, 2008 subcontracts contain handwritten and initialed provisions for half and final payments.

[18] Defendants now also assert an essentially identical Subcontractor Agreement for Timberlake building 13 as part of the relevant contractual relationship.  See, *e.g.*, Defendants' MLS of Opposition (ECF No. 152) ("Although 84 Lumber does not explicitly recognize the Subcontractor Agreement for Timberlake Building 13 as forming a part of the parties' contractual relationship, there can be no genuine dispute that Timberlake 13 is included and is at issue in this case.").  And yet this same document acknowledges that the Second Amended Complaint brings claims asserted quite specifically on the basis of the five (5) Subcontractor Agreements and those five (5) subject duplex construction projects.  See *id.* ("Counts IV-VIII set forth breach of contract claims for breach of five Subcontractor Agreements concerning construction at Timberlake Buildings 8, 11, 12 and Cedar Creek Buildings 1 & 2, respectively.").

employees).  The Court also notes the facts of record regarding the duration and scope of Mortimer's experience in residential construction.

Defendants assert that their harm from Plaintiff's actionable conduct includes not only diminution in value of the subject properties, but other development properties as well, and more generally, their business reputations and related income, and financing positions and costs. <u>See, e.g.</u>, Second Amended Complaint (ECF No. 44). The Court is compelled to note, particularly in light of the case history, the many potential other factors - such as possible overextension of Defendants' construction business, market downturns generally or in Defendants' geographic or other area, and other potentially extensive fact questions - related to damages on trial. It must also note that the evidence regarding Plaintiff's liability on the basis of CCA overcharges during or after 2008, and/or fraudulent or negligent inducement or misrepresentations generally (*i.e.*, those tort claims distinct from claims sounding in contract and accordingly subject to any applicable contractual limitations of damages provisions, properly construed), has been at this juncture subject only to a summary judgment standard. Should the case proceed, the evidentiary standard will be one of a quite different degree.

And most emphatically, the Court must direct (a) Plaintiff's attention to the actual dates and actual language (in many quite significant respects) of 84 Lumber's own CCA and Subcontractor Agreements as differentiated from Plaintiff's litigation assertions, and the present substantial factual record (including evidence such as testimony and expert reports) as to construction defects and repair/replacement costs; and (b) Defendants' attention to the relative absence of contract provisions regarding particular laborers, the Subcontractor Agreements' own limitation of damage provisions applicable to construction defects, the present factual record as to the construction material costs owed, and the less-substantial factual record as to the surviving fraudulent/intentional or negligent misrepresentation claims.

**<u>Procedural History</u>**

As discussed above, 84 Lumber, a Pennsylvania limited partnership, initiated this litigation by the filing of a Complaint in the Court of Common Pleas of Allegheny County in April, 2011 against Gregory Mortimer Builders ("GMB"), a Maryland development corporation, as Defendant, and Gregory Mortimer ("Mortimer"), an individual residing and engaged in residential development in Maryland, as Guarantor; and said parties removed it to this Court on April 28, 2011 (ECF No. 1). The Complaint asserts (implicitly on the basis of the 2009 CCA later asserted to have been mailed to Mortimer, since there is no such provision in the 1997 CCA) that the Defendant contractually agreed to Pennsylvania jurisdiction/litigation. It includes counts for (1) breach of contract against Gregory Mortimer Builders (under the CCA) owing to GMB's purchase, receipt and nonpayment "on [GMB's] account", of approximately $579,000 in goods/supplies delivered, together with ongoing fees/penalties and attorney's fees; (2) breach of contract against Mortimer as personal guarantor "of [GMB]'s obligations" under the CCA; and (3) separate counts against each Defendant for unjust enrichment in the alternative. ECF No. 1, Ex. A.

In May, 2011, Defendants responded with an Answer and Counter-Claim (ECF No. 2), adding M&M Development, LLC (the Mortimer-affiliated entity holding title to the real estate developed, hereafter "MMD") as an additional counter-plaintiff and asserting, in a somewhat convoluted and overlapping manner, counter-claims:

(a) by all Defendants for negligent construction, and for fraud/intentional misrepresentation in allegedly (i) representing that construction experts and specialists who were employed as part of 84 Lumber's existing national program would perform Defendants' subcontracted work, (ii) representing that such work was subsequently properly performed and/or would be corrected,

and (iii) improperly charging and subsequently concealing charges to Defendants' CCA account; and

(b) by Mortimer for breach of contract as to each of five (5) units separately subcontracted for construction work by 84 Lumber, and separate counts for (a) breach of contract for materials and labor generally (but compare 84 Lumbers' Complaint and the underlying documentation regarding parties to the 1997 CCA) and (b) an accounting.

The counts for negligent construction (Count I) and an accounting (Count IX) were voluntarily withdrawn by Defendants' Amended Counterclaim (ECF No. 15) filed in response to 84 Lumber's May 26, 2011 Partial Motion to Dismiss (ECF No. 10).

During the Fall of 2011 the parties attempted Alternative Dispute Resolution ("ADR") but the case was not resolved. Defendants' Second Amended Counterclaim, comprised of nine (9) Counts, 36 pages and 223 paragraphs, was filed April 9, 2012 (ECF No. 44). It was followed by a request to modify the Amended Counterclaim to incorporate existing allegations on fraudulent misrepresentations already set forth in Count I (a claim for fraud in the inducement by Mortimer) in an additional claim by all Defendants for negligent misrepresentation (a new Count II). See Defendants' March 19, 2012 Motion for Leave to Amend Amended Counterclaim (ECF No. 35) (mis-identifying Amended Counterclaim Count I as brought by "Counter-Plaintiffs" rather than solely Mortimer). The Second Amended Counterclaim (ECF No. 44) sets forth claims:

(a) by each of the Defendants for (i) unspecified negligent misrepresentations (implicitly and by incorporation those misrepresentations made to Mortimer and underlying Count I), and (ii) fraud/intentional misrepresentation/concealment expressly with regard to Summer, 2009

representations to Mortimer regarding faulty construction issues and Plaintiff's intent to correct or purported correction of them (Counts II and III, respectively);[19] and

(b) by Mortimer for breach of contract as to each of five (5) separately subcontracted Timberlake (8, 11, 12) and Cedar Creek (1, 2) units (Counts IV-VIII); breach of contract more clearly delineated as to the Commercial Credit Agreement (Count IX), specifically by false and/or excessive charges and concealment;[20] and fraud in the inducement (Count I) by both (i) misrepresenting that improper CCA charges made in 2007 by a subsequently-fired Maryland manager would not recur and that a Fall 2008 internal audit was conducted and showed no improper CCA charges, and (ii) misrepresenting that subcontracted work would be performed by 84 Lumber's national "install program" construction experts/specialists.

There followed this Court's grant of Branch Banking & Trust Company's March, 2012 Motion to intervene to protect its financial interests in the Timberlake and Cedar Creek properties, and the May 25, 2012 filing of its Third Party Complaint alleging negligence in construction/conduct against 84 Lumber (ECF No. 54).[21]  Over the next year and during Summer 2013, discovery proceeded with motions for protective orders, injunctions and sanctions (see, e.g., Plaintiff's December 19, 2012 Motion) (ECF No. 77), substitution of defense counsel, and motions to exclude witnesses/reports (see, e.g., Plaintiff's July 17, 2013 Motion) (ECF No. 93).

---

[19] Compare Plaintiff's Damages Motion, ECF No. 144, asserting that "[o]nly Defendant Mortimer brings contract claims (Counts IV-IX) and Counts I and II; thus the other Defendants are irrelevant to any discussion of those claims."

[20] This brief Count alleges only that 84 Lumber charged for unprovided materials, overcharged and/or substituted lesser materials, and that it invoiced and delivered in manners intended to conceal these practices.  See Second Amended Complaint (ECF No. 44).

[21] The record reflects the Bank's concern of the impact of Mortimer's financial straits on his ability to retain counsel/conduct litigation and preserve recourse against 84 Lumber in an appropriate and adequate manner.

Various continuances, extensions and stays were granted and settlement was again unsuccessfully explored in Fall, 2014. Mediation was held in January, 2015 and the case was again continued, through Spring, 2015, at which time expert discovery and dispositive motions deadlines were scheduled. See ECF No. 140. The pending motions followed a few months later.

The Court must pause to note that the history of the case, including the Motions and supporting documentation presently pending, reflect changes in counsel, questionable characterizations of both the facts and the law on the part of all parties, mutual over-reaching, and an unfortunate degree of litigiousness, all of which have undoubtedly contributed to the parties' inability to reach resolution of this matter.

The Court must also note - upon completion of its extensive and through review of the now voluminous record - that the damages ultimately at issue given the Subcontractor Agreements' provisions regarding damage limitations; the factual support of record as to construction defects and reasonably associated costs, the factual strength of the remaining fraudulent and negligent misrepresentation claims, and damages attributable to reliance thereon; the parties' histories; and the Defendants' alleged outstanding materials costs as against the Plaintiff's outstanding liability for contractual construction undertakings/alleged breaches, all strongly suggest that the parties would be best served by resolution of this matter by means other than a series of pre-trial motions and a fact-intensive, protracted trial.

As noted above, currently pending are:

(1) Plaintiff's August 10, 2015 MPSJ (ECF No. 145) seeking summary judgment on Defendants' tort claims (fraud in the inducement by Mortimer (Count I); negligent misrepresentation (premised on the same allegations) by all Defendants (Count II); and

fraud/intentional misrepresentation (premised on defective-construction related conduct) by all Defendants (Count III)) and claims for punitive damages; and

(2) Plaintiff's August 10, 2015 Damages Motion (ECF No. 144) seeking summary judgment on the basis of (a) the absence of any contractual relationship with any party but Mortimer and (b) contractual and legal damage limitations.  This motion seeks the Court's judgment that (1) Defendant Gregory Mortimer is the only party that may seek damages from 84 Lumber; (2) Mortimer's damages, to the extent any exist, are limited to contractually endorsed repair or replacement costs regardless of whether claims sound in tort or contract; (3) Mortimer is not entitled to consequential, exemplary, punitive, or compensatory damages and is likewise forbidden from seeking attorney's fees, costs, and interest; (4) the contractual limitations period for filing claims forbids all Counterclaims; and (5) Mortimer has not, and cannot, suffer damages.

(3) Defendants' September 11, 2015 Cross-Motion for PSJ (ECF No. 151), which is limited to summary judgment as to liability on Mortimer's individual breach of contract claims set forth in Counts IV through IX of the Second Amended Complaint, on the basis that "the parties entered into six valid, enforceable construction contracts and one valid, enforceable credit agreement" and "[t]here is no genuine dispute that 84 Lumber failed to perform its own obligations and materially breached each of these contracts."

(4) Defendants' MPSJ of the same date (ECF No. 149), which asserts that "[a]s a matter of law, 84 Lumber may not recover damages on a claim of breach of [the CCA] because Mortimer's subsequent nonpayment is excused. It further asserts that 84 Lumber's unjust enrichment claims fail as a matter of law because the parties' express contracts control the claims" and seeks dismissal of 84 Lumber's Complaint.

## III.    GENERAL APPLICABLE STANDARDS ON SUMMARY JUDGMENT

Summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support the claim; rather, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. *See* Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992). *See also* Celotex, 477 U.S. at 324 (observing that Rule 56(e) permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).

The inquiry to be made is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." The non-moving party "must be able to produce evidence that 'when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor.'" SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir.1997) (quoting Kline v. First W. Gov't Sec., 24 F.3d 480, 484 (3d Cir.1994)). If the non-moving party fails to present evidence sufficient to establish an "element essential to that party's case, and on which that party will bear the burden

of proof at trial", summary judgment is appropriate.  Celotex, 477 U.S. at 322. Where there is no

material fact in dispute, the moving party need only establish that it is entitled to judgment as a

matter of law.  Fed.R.Civ.P. 56(c)(2).


IV.   **ANALYSIS**

A. **Choice of Law**

The assertion in Plaintiff's Damages Motion, ECF No. 144 p.6, that "Pennsylvania law

controls - at a minimum – contractual interpretation issues" [22] is premised on Mortimer's

acknowledged receipt, and incorporation in the SA, of an unspecified CCA - which Plaintiff

asserts to be indisputably the 2009 CCA containing a Pennsylvania choice of law provision as to

"[t]his Agreement" (as opposed to the 1997 CCA received and executed by Mortimer, the terms

and conditions of which contain no choice of law provision).  See ECF No. 144 ("Ignoring [the

2009 CCA's] choice of law clause would require the Court to invalidate a material provision of the

SAs. Of course, this Court's jurisprudence requires the opposite: Pennsylvania law controls.")  As

discussed at length, material fact questions exist as to this issue. First, did Mortimer ever receive the

2009 CCA?  Is the 2009 CCA applicable to any portion of the parties' course of dealing?[23]  All of

these issues preclude summary judgment on this issue.  See, *e.g.,* Newman-Green, Inc. v. Alfonzo-

Larrain R., 605 F. Supp. 793 (N.D. Ill. 1985) (finding issues of material fact concerning parties'

choice of law intentions precluded summary judgment in action for enforcement of obligations

---

[22] As Defendant correctly asserts, the proffered contract language would not control non-contract
counter-claims.

[23] Such considerations are raised, *e.g.,* by the document's date and effective date provisions; and
as to, *e.g.*, the reasonable intent and scope, in light of its language, of the 2009 CCA's new
integration paragraph 12 and the self-referential language of paragraph 15's choice of law
provisions ("This Agreement shall be governed . . . ).

under agreement); Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc., 689 F.2d 982 (11th Cir. 1982) (concluding issues of material fact existed as to applicability choice of law principles to contract, determination, precluding summary judgment); CSS-Wisconsin Office, an Operating Div. of Consumer Satellite Systems v. Houston Satellite Systems, Inc., 779 F.Supp. 979, 983 (E.D.Wis.1991) (finding issue of material fact regarding parties intent as to contract's choice of Texas law provision precluded summary judgment).

Absent a binding agreement to Pennsylvania law, it is clear from those facts not in question (the Maryland location of the Defendants and their residential development enterprises; the Maryland location of Plaintiff's Garrett County store, Defendants' CCA account, and alleged materials account liabilities (on the parts of both 84 Lumber and Defendants); the location of alleged representations/misrepresentations; and the location of the alleged defective construction, Code violations and breaches of the Subcontractor Agreements and resultant harm to Defendants), that Maryland law would apply to claims regarding the parties' contract performance as well.

    **B.** __Breach of Contract Related Claims__

Defendants' Second Amended Counterclaim brings counts for breach of contract solely by Mortimer as to each of five (5) Timberlake and Cedar Creek Subcontractor Agreements and the CCA (Counts IV through IX). Defendants' somewhat convoluted Cross-Motion for PSJ, ECF No. 151, seeking summary judgment as to liability on these counts will be denied because, as explained, *supra*, the record does not entirely remove from a reasonable fact-finder the establishment of 84 Lumber's liability on the basis that "the parties entered into six valid, enforceable construction contracts and one valid, enforceable credit agreement" and "[t]here is no genuine dispute that 84 Lumber failed to perform its own obligations and materially breached each of these contracts." See Defendants' Opposition to Plaintiff's MPSJ (ECF No. 151).

Plaintiff's April, 2011 Complaint, ECF No. 1, Ex. A, brought, on the basis of the CCA, four (4) separate counts comprised of breach of contract and, in the alternative, unjust enrichment claims against both GMB, as the account holder and obligor, and Mortimer as the guarantor. Defendants' MPSJ, ECF No. 149, seeks dismissal of all counts of the Complaint. To the extent Defendants assert that Plaintiff's claims should be dismissed owing to the latter's material breach, they err. The starting point is that Plaintiff is entitled to contract pricing for substantial performance subject to remedies for breaches. This Motion will be denied as to all claims but Count IV, Unjust Enrichment against Mortimer, as - Defendants' lengthy and repeated assertions to the contrary notwithstanding - the record fails to remove from a reasonable fact finder questions as to Plaintiff's material breach. For example, there are allegations of breach of the Subcontract Agreements by the use of non- or inadequately skilled workers, by substandard construction workmanship, and/or by failure to correct or repair such workmanship. Assuming such breach is established, there remains the question of the materiality of said breach to Defendants' non-payment(s) under the applicable CCA. Beyond the establishment of 84 Lumber's liability, until damages pursuant to its breach of the Subcontractor Agreements have been liquidated as a finding of fact, it cannot be concluded that the existence of such breach excused, as is here asserted, Defendants' non-payment for construction materials under the CCA as a matter of law. Compare Defendants' MLS of Opposition (ECF No. 152) (asserting that 84 Lumber's material breach of its own obligations relieved "Mortimer of his obligation to pay", entitling him "to judgment as a matter of law on liability").

And although Defendants are correct that where an express contract clearly governs, the plaintiff cannot maintain an equitable claim for unjust enrichment in the alternative, it is less than clear from the parties' pleadings whether they maintain that Defendant GMB did or did not have

a contractual relationship with 84 Lumber under the CCA –although the initial Complaint expressly alleges that it did.  Accordingly, Count III, Unjust Enrichment as against GMB remains permissible in the alternative, as the liability of GMB could then become a question of *quantum meruit*. On the other hand, Defendants' alternative Count IV, as against Mortimer, individually, whom the parties unequivocally agree was a contractual party to the CCA governing the material purchases at issue, cannot stand.

### C.  Tort (Fraud/Negligent Misrepresentation Related) Claims; Punitive Damages

Defendants' Second Amended Counterclaim, ECF No. 44, brings the following tort claims:

Count I by Mortimer for fraud in the inducement by both (i) misrepresenting that improper CCA charges made in 2007 by a subsequently-fired Maryland manager would not recur and that a Fall 2008 internal audit was conducted and showed no improper CCA charges, and (ii) misrepresenting that subcontracted work would be performed by 84 Lumber's existing national "install program" construction experts/specialists; Count II by all Defendants for negligent misrepresentation, premised on the allegations underlying Count  I; and Count III by all Defendants for fraud/intentional misrepresentation/concealment expressly with regard to Summer, 2009 representations to Mortimer regarding faulty construction issues and Plaintiff's intent to correct or purported correction of them.

The Court notes that in a summary judgment determination on the elements for a cause of action for tortious misrepresentation, whatever the *mens rea* component alleged (*i.e.,* intentional/fraudulent or negligent), questions of the degree of intent usually entail fact questions inappropriate for resolution on summary judgment, and both fraudulent and negligent misrepresentation claims contain a requirement of fault.  Such cause of action also requires

material fact(s) intended to induce and demonstrably inducing reasonable reliance to the plaintiff's detriment. Thus, the showings evaluated on summary judgment include those on the elements of (a) present misrepresentation as to material fact(s) and (b) detrimental reliance. And in circumstances such as those *sub judice*, the detrimental reliance is generally entry into/continuation in/performance under the parties' contractual relationship and this is the causal nexus between the defendant's wrongful conduct and the plaintiff's injury. <u>See generally</u> Plaintiff's MPSJ, ECF No. 145 (citing cases regarding elements of misrepresentation).

Plaintiff's MPSJ, ECF No. 145, seeks summary judgment as to Defendants' tort claims (Counts I-III) and claims for punitive damages. The Court will deny said Motion as to Count I, Fraudulent Inducement, brought only by Defendant Mortimer. As to the underlying allegations of representations that improper charges would not recur, the Court notes the long-established general rule that claims of intentional misrepresentation cannot be predicated upon statements made with the intent of inducing reliance, but which are promissory in nature and relate to future actions or conduct, unless it can be established that the statements were made with no present intention of carrying them out. <u>See generally</u>, *e.g.*, 125 A.L.R. 879 (1940), Promises and Statements as to Future Events as Fraud (annotating that "fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events" unless "made without intention of performance"). But representations as to the performance and results of an audit are statements of present and existing fact (rather than promissory). To the extent Defendants may establish, under the stricter standard applicable hereafter, that actionable misrepresentations (a) occurred and (b) were relied upon by Defendants who incurred specific harm/detriment therefrom, those misrepresentations may ground 84 Lumber's liability related to continued material purchases and CCA dealings. The Court

observes the record's albeit limited support of questions of material fact.   As to the underlying

allegations of representations regarding contract work performance by 84 Lumber's existing

national "install program" construction experts/specialists, the Court again notes the distinction

between a promise of future performance (with or without absence of intent) and

misrepresentation of a present material fact, *e.g.*, that 84 Lumber had a national program of

qualified/available construction specialists.  The record clearly shows the existence of questions

of material fact on these issues.

The Court will grant this Motion as to Count II, negligent misrepresentation, as brought

by Defendant M&M Development, LLC a non-party to the 1997 Commercial Credit Agreement

because none of the allegations on which this Count is premised provide a basis of liability to

MMD (*e.g.*, the record raises no material question of its detrimental reliance in continued

contractual/business dealings).  The claim must stand, however, as to both Mortimer and GMB

given the record, as allegations regarding misrepresentations resulting in continued business

dealings under the CCA provide a potential basis of liability to GMB.

The Court will also grant the Motion as to Count III, fraudulent/intentional

misrepresentation related specifically to Plaintiff's defective/negligent construction and/or failure

to repair/replace under the Subcontractor Agreements, as brought by the non-individual

Defendants, as Defendant Mortimer is the sole contractual party.  To the extent such claims stand

separately from contract claims for fraud in factum/performance (as perhaps by, *e.g.*,

misrepresentations of promise without intent or misrepresentations of repair work performed),

the causal nexus remains contractual.  See discussion, *supra*.  See also, *e.g.*, Bruno v. Erie Insur.

Co., 106 A.3d 48, 71 (Pa. 2014) (explaining that where tort claim was founded on breach of

broader social duty rather than contractual obligation, the contract is regarded "as the vehicle

which established the relationship between" the parties, "during the existence of which" the tort was committed).

In denying summary judgment as to some of Defendants' tort claims, the Court again notes the presently applicable standard, and the degree of sufficiency of the evidence as to, *e.g.*, particular misrepresentations and detrimental reliance.

Finally, the Court will grant the Motion for summary judgment as to punitive damages. Defendants are not, under the record of this case, entitled to maintain any potential claim for punitive damages and Plaintiffs' pleadings analysis is sufficiently correct in this regard. Such damages as to breaches of contract (as by, *e.g.*, negligent work performance) are clearly precluded by the Subcontract Agreement provisions.[24] As to other claims, the allegations and record do not raise material fact questions of malice or reckless indifference, sufficient to merit a punitive damage award.

### **Remaining Damages**

Plaintiff also brings a Damages Motion, ECF No. 144, and said Motion must be denied for the following reasons: the record does *not* establish for summary judgment purposes that (1) Mortimer is the only party that may seek damages from 84 Lumber;[25] (2) damages under every remaining claim are legally limited to contractually endorsed repair or replacement costs;[26] (3) the

---

[24] Defendants' assertion that by material breach of the Subcontractor Agreements Plaintiff loses the limited remedy protections (as to, *e.g.*, consequential damages) set forth therein is in error. The limitations remain as to claims encompassed by the express provisions (as opposed, *.e.g.*, as to other remaining claims, as to which there is, however, less evidence in substantiation of Plaintiff's wrongful conduct or Defendants' degree of harm).

[25] Compare, *e.g.*, discussion of CCA's written provisions, disputes of material fact, and the Counts of and parties to Plaintiff's initial Complaint.

[26] Compare, *e.g.*, Plaintiff's Damages Motion (asserting that because the Subcontract Agreements state that "in no event" is 84 Lumber liable for any damages other than repair or

parties to whom Plaintiff may be liable under the pending claims are not entitled to consequential, exemplary, punitive, or compensatory damages, attorneys fees, costs, and interest;[27] (4) the contractual limitations period bars all Counterclaims;[28] or (5) Mortimer – the only contracting party - has not, and will not, suffer any "repair and replacement" damages.[29]   As noted, *supra*, the Motion is mooted as to any overlapping request for punitive damages, on which question summary judgment will be granted.

A separate Order will follow.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc:      Counsel of record

---

replacement costs, Defendants are constrained from other damages under fraud or any other civil theory of liability) with discussions of questions of interpretation and non-applicability to remaining potential tort liabilities.  The Court again directs the parties to the actual language of Paragraph 15, which expressly limits "liability hereunder" to the "extent of 84's negligence" and its obligations to "repair or replacement of any defective or nonconforming [w]ork" and precludes "any consequential, indirect, exemplary or punitive damages of any type in connection with any claim under this paragraph."

[27] Compare discussions, *supra*, including material fact questions as related to receipt, applicability, intent/interpretation (and potential subsequent questions of enforceability) of 1997 and 2009 CCAs.  The Court concurs, however, that under no circumstances adequately supported by the record could a Defendant be entitled to punitive damages.

[28] Compare Subcontractor Agreements' express provision as to one-year guarantee of materials and discussion, *supra,* with Plaintiffs' Damages Motion (asserting as dispositive that (a) Mortimer, the only contractual party, never owned any of the properties at issue; (b) Mortimer was dispossessed of all units more than a year before filing his Counterclaim; and (c) no Defendant owned 4 of the 10 units covered by the five building contracts on or after May 5, 2010).

[29] See, *e.g.*, Plaintiff's Damages Motion (asserting that – given absence of evidence of contractual liability terms between Mortimer and the development property owner, M&M, or a timely legal claim by the latter against the former - Mortimer is exempt from liability and so then, too, is 84 Lumber).  The assertion is frivolous.