**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| 84 LUMBER COMPANY, L.P. | ) | |
| | ) | Civil Action No. 11-548 |
| Plaintiff/Counter-Defendant | ) | |
| | ) | Magistrate Judge Lisa Pupo |
| v. | ) | Lenihan |
| | ) | |
| GREGORY MORTIMER BUILDERS, | ) | |
| *et al.* | ) | |
| Defendants/Counter-Plaintiffs | ) | |

## MEMORANDUM OPINION ON CONTRACTUAL DAMAGE LIMITATIONS

**I.      SUMMATION**

The Court acknowledges the contributions of counsel on their bench trial briefing of the issues identified during the July 28, 2016 Status Conference.  *See* July 29, 2016 Order, ECF No. 200.  By the Court's April 20, 2016 Pretrial Order, ECF No. 171, a Bench Trial is scheduled for October 31, 2016.  For the instruction of the parties to aid in preparation for the trial, the Court issues the following Opinion.

For the reasons set forth more fully below, the Court predicts and concludes that, under Maryland law reflecting accord with the general law merchant, the parties' contractual language precluding "any consequential, indirect, exemplary or punitive damages of any type" is an independent provision.  And thus under Maryland law, absent unconscionability, a contractual prohibition against consequential damages remains in effect even where the

parties' "repair or replacement" provision may fail of its essential purpose.  *See* Patapsco Designs, Inc. v. Dominion Wireless, Inc., 276 F.Supp.2d 472 (D. Md. 2003) (predicting that under Maryland law, as reflected in adoption of UCC, limitation on damages did not fail even if repair and replacement provision failed of essential purpose; rather, damage limitation was freely contracted independent allocation of risk between business parties and remained subject to unconscionability standard).  *Cf.* Waters v. Massey-Ferguson, Inc., 775 F.2d 587 (4th Cir. 1985) (predicting that under South Carolina law and particular circumstances of contract on case-by-case basis, consequential damage limitation did not extend to long-term damages where reasonable repair and replacement was not made by manufacturer and provision failed of essential purpose).  Because the contractual damage limitation provisions at issue were not unconscionable under Maryland law, and because they are not forfeited under any of Defendants' alternative rationales, the limitation provisions remain enforceable as to those contract claims encompassed by the parties' clear language, *i.e.*, they limit damages related to/flowing from "defects in workmanship or materials."  *See* discussion, *infra* (addressing claims of fraudulent inducement, ratification, and damages proximately caused by specific misrepresentation(s)).

The Court further concludes that, under Maryland law, recovery for lost profits is unambiguously precluded by the parties' contractual limitation of damage provisions.

## II.  <u>RELEVANT FACTUAL AND PROCEDURAL HISTORY</u>

The extensively documented factual and legal history in this case arising from disputes between the parties with regard to (a) construction material purchases and (b) sub-contracted construction of housing in Defendants' multi-duplex residential developments – Timberlake Village (hereafter "Timberlake") and Cedar Creek –  located near Deep Creek Lake, in Garrett

2

County, Maryland was explicated by this Court in its Summary Judgment Opinion, ECF No. 166. In relevant part: the parties executed contract documents including an 84 Lumber Commercial Credit Application form dated May 9, 1997 (the "1997 CCA"), signed by Gregory Mortimer ("Mortimer"). *See, e.g.*, ECF No. 12, Ex. 1. In October, 2007, the parties entered into a settlement agreement that included compensation for improper CCA billing activity relating to a residential project (the "2007 Settlement"). *See*, *e.g.*, Memorandum of Law in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment (Defendants' Memo of Law in Opposition to PSJ") at 4, ECF No. 156. In addition, Mortimer and 84 Lumber were the signatories to 84 Lumber "Subcontractor Agreement/Scope of Work" forms (the "Subcontractor Agreements") for the installation of purchased materials at five (5) development projects - three (3) at Timberlake (buildings 8, 11 and 12) and (2) at Cedar Creek (buildings 1 and 2). *See, e.g.*, ECF No. 12, Ex. 1.[1] More particularly, Timberlake contract #8 was signed in April, 2008; Timberlake contract #12 was signed in late August, 2008; and Timberlake contract #11 and the two Cedar Creek contracts were signed by Mortimer at the end of October, 2008 and by 84 Lumber in December, 2008. *See* Defendants' Combined Statement of Material Facts at 6-7, ECF No. 153.

Each of these essentially identical Subcontractor Agreements provided that the work would be properly performed "per print and manufacturer specifications", with "competent supervision", and would "meet or exceed local building codes" and "pass all required

---

[1] *See* Summary Judgment Opinion at 11, ECF No. 166 (noting that the Second Amended Counterclaim, ECF No. 44, brings claims asserted on the basis of five (5) Subcontractor Agreements and those five (5) subject duplex construction projects). *See also* Plaintiff's Memorandum of Law Concerning Damages Available Under Contract Claims ("Plaintiff's Memo of Law") at 1, ECF No. 202.

inspections". *See, e.g.,* ECF No. 15, Ex. A.  Paragraph 14 provided that the terms and conditions of "84 Lumber Company's Contractor-Commercial Credit Agreement", "a copy of which [Mortimer] hereby acknowledges receiving" were "incorporated herein by reference".  Id.

Subcontractor Agreement paragraph 15 contained, among other things, 84 Lumber's "guarantee" that the work would conform to specifications, comply with laws, and be free from defects in workmanship and materials.  Paragraph 15 limited 84 Lumber's "liability hereunder" to the "extent of 84's negligence" and its obligations to "repair or replacement of any defective or nonconforming [w]ork."  Mortimer agreed that 84 Lumber was "in no event" liable "for any consequential, indirect, exemplary or punitive damages of any type in connection with any claim under this paragraph." And the paragraph closed with a form language disclaimer of any further express or implied warranty, including warranty of merchantability or fitness for a particular purpose.  Id.

Defendants assert that Plaintiff materially breached each Subcontract Agreement by, *e.g.*, failing to install materials according to manufacturer's instructions and failing to conform to local building code; that Defendants received Correction Notices from the County Office of Buildings and Permits; and that Plaintiff made misrepresentations as to its work performance and failed/refused to make and made further misrepresentations regarding the requisite repairs to its work.  Defendants also assert that their harm from Plaintiff's actionable conduct includes not only diminution in value of the subject properties, but other development properties as well, and more generally, *e.g.*, their business reputations and related income, and financing positions and costs.  *See, e.g.,* Second Amended Counterclaim, ECF No. 44.

For a full discussion of the prior procedural history, *see* ECF No. 166.  The relevant claims documents are:

4

The Complaint against Gregory Mortimer Builders ("GMB"), as Defendant, and Mortimer, as guarantor, removed to this Court on April 28, 2011 (ECF No. 1) and asserting counts for (1) breach of contract against Gregory Mortimer Builders (under the CCA) owing to GMB's purchase, receipt and nonpayment "on [GMB's] account", of approximately $579,000 in goods/supplies delivered, together with ongoing fees/penalties and attorney's fees; (2) breach of contract against Mortimer as personal guarantor "of [GMB's] obligations" under the CCA; and (3) separate counts against each Defendant for unjust enrichment in the alternative. *See* ECF No. 1, Ex. A. The count for unjust enrichment against Mortimer was dismissed by this Court. *See* ECF No. 166. Plaintiff's entitlement to attorney's fees was assessed in the Summary Judgment Opinion. *See* id. at 4 n. 4, and 6, ECF No. 166.

The Defendants' Second Amended Counterclaim (ECF No. 44) setting forth claims:

(a) by each of the Defendants for (i) unspecified negligent misrepresentations (implicitly and by incorporation those misrepresentations made to Mortimer and underlying Count I), and (ii) fraud/intentional misrepresentation/concealment expressly with regard to Summer, 2009 representations to Mortimer regarding faulty construction issues and Plaintiff's intent to correct/purported correction of them (Counts II and III, respectively);[2] and

---

[2] *See* Defendants' Combined Statement of Material Facts at 20, ECF No. 153 (stating that in Spring and Summer 2009, Mortimer received "numerous reports of leaks at units at both Timberlake and Cedar Creek" and notified 84 Lumber, and that in August and September 2009 he consulted experts, made written demands for repair and 84 Lumber "repeatedly represented that [it] would correct all construction defects"); id. at 21 (recounting that in August through mid- September 2009 84 Lumber retained other construction contractors to investigate and repair the defects and falsely represented they were corrected); id. at 22 (continuing chronology with assertion that "[d]espite the numerous leaks and other defects apparent at that time" Mortimer paid Plaintiff in full for the subcontracts on Buildings 8 and 12, but withheld subcontract payments on other buildings.). *See also* Defendants' Memorandum of Law in Opposition to Partial Summary Judgement ("Defendant's Memo of Law in Opposition to PSJ") at 6, ECF No.

(b) by Mortimer for breach of contract as to each of five (5) separately subcontracted

Timberlake (8, 11, 12) and Cedar Creek (1, 2) units (Counts IV-VIII); breach of contract more

clearly delineated as to the Commercial Credit Agreement (Count IX), specifically by false

and/or excessive charges and concealment;[3] and fraud in the inducement (Count I) by both (i)

misrepresenting that improper CCA charges made in 2007 by a subsequently-fired Maryland

manager would not recur[4] and that a Fall 2008 internal audit was conducted and showed no

improper CCA charges,[5] and (ii) misrepresenting that subcontracted work would be performed

---

156 (asserting that Plaintiff's "August and September 2009" multiple representations that it corrected and would correct all construction defects were false).

[3] This brief Count alleges that 84 Lumber charged for unprovided materials, overcharged and/or substituted lesser materials, and that it invoiced and delivered in manners intended to conceal these practices. See Second Amended Counterclaim, ECF No. 44.

[4] See Defendants' Combined Statement of Material Facts at 4-5, ECF No. 153 ("Following the execution of the settlement agreement, [84 Lumber employees] verbally represented to Mortimer that there were no other improper charges to [the CCA] account and that there would be no further improper or excessive charges to [it]."); Defendant's Memo of Law in Opposition to PSJ at 4, ECF No. 156 ("[These] representations . . . . were . . . false in that immediately following the settlement agreement and the representations, 84 continued to improperly charge Mortimer's account *on the [prior residential] project*.") (emphasis added). *See also* Defendants' Combined Statement of Material Facts at 12, ECF No. 153 *("During August 2008, before Mortimer executed the Subcontractor Agreements for Timberlake Building 11 and Cedar Creek Buildings 1 & 2, 84 Lumber employees informed Mortimer that 84 Lumber . . . was manipulating inventory and intentionally overcharging, double-billing and failing to properly credit his account.").*

[5] See Defendants' Combined Statement of Material Facts at 12-13, ECF No. 153 (recounting that on notice from 84 Lumber employees, "Mortimer then informed 84 Lumber representatives [and] questioned certain invoices . . . . In early September 2008, [Mortimer met with 84 Lumber representatives who informed him] the Store Manager . . . . had been fired for theft, . . . 84 Lumber had investigated Mortimer's account . . . [and the] audit did not show any wrongful billing or manipulation of his account"); id. ("On October 1, 2008, Mortimer [received correspondence from Plaintiff stating that an audit of the Maryland store] "did not reveal any manipulation of either the quota system or inventory [or] any misuse of the invoicing system").

by 84 Lumber's national "install program" construction experts/specialists.[6]  The following

counts were dismissed by this Court: (a) Count II, negligent misrepresentation as brought by

Defendant M&M Development, LLC a non-party to the 1997 CCA and Count III,

fraudulent/intentional misrepresentation related to Plaintiff's defective/negligent construction

and/or failure to repair/replace under the Subcontractor Agreements, as brought by the non-

individual Defendants.  *See* ECF No. 166.


## III.  ANALYSIS

### A.  Independence of Limitation Excluding Consequential Damages

As noted *supra*, untitled paragraph 15 of the Subcontract Agreements contains 84

Lumber's guarantee against "defects in workmanship and materials" and limits 84 Lumber's

---

Cf. id. at 14 (Mortimer relied upon 84 Lumber's false and misleading assurances that no
improper billing or manipulation of his account had occurred [and] would not have executed the
Subcontractor Agreements for Timberlake Building 11 and Cedar Creek Buildings 1 & 2 without
these representations.").  The Court observes the execution dates of these contracts, as well as
that for Timberlake Building 12, *i.e.,*: the first Subcontractor Agreement was executed in April,
2008 (Timberlake #8); the second (Timberlake #12) *in late August, 2008*; and the additional
three (3) in late October, 2008.

[6]  *See* Defendants' Combined Statement of Material Facts at 5-6, ECF No. 153 ("In 2007 and
2008, 84 Lumber represented to Mortimer that it had experienced and skilled construction
experts and specialists that were capable of constructing homes of the type Mortimer intended to
build at Timberlake and Cedar Creek . . . . 84 Lumber represented to Mortimer that these
construction workers were part of 84 Lumber's "in-house" install program . . . ."); Defendant's
Memo of Law in Opposition to PSJ at 4, ECF No. 156 ("84 Lumber's representations regarding
the skill and quality of the workers it intended to use at [Defendants'] projects were . . . false in
that the workers used immediately on Mortimer's projects following the representations were . . .
local friends and family of 84 Lumber local store employees.").

Cf. Defendants' Combined Statement of Material Facts at 6, ECF No. 153 ("In reliance
on 84 Lumber's representations regarding the skill and quality of its 'install program'
construction crews, and in reliance on 84 Lumber's representations that there were no further
improper or excessive charges to Mortimer's account, Mortimer agreed to expand 84 Lumber's
role from supplier to primary subcontractor.").

obligations thereunder "at [its] sole election, to the repair or replacement of any defective or nonconforming Work." Additional provisions of paragraph 15 include those specifying that "in no event" would 84 Lumber be liable for "any consequential, indirect, exemplary or punitive damages of any type in connection with any claim under this paragraph."

Defendants assert that 84 Lumber's delays, failures, misrepresentations and/or effective refusals to repair or replace defective workmanship rendered the contractual limitation to elective repair or replacement unenforceable because such provision "failed of its essential purpose." As Defendants discuss, failure of essential purpose of a repair and replacement provision "is relatively straightforward." Defendants' Memo of Law at 7, ECF No. 201. *See also* Plaintiff's Memo of Law at 5-6, ECF No. 202 (stating -as do Defendants - that in Maryland, repair and replacement remedy fails of essential purpose if seller has refused to make repairs as required or cannot repair) (citing Potomac Constructors, LLC v. EFCO Corp., 530 F.Supp.2d 731 (D. Md. 2008)); Riegel Power Corp. v. Voith Hydro, 888 F.2d 1043, 1046 (4th Cir. 1989). *Cf.* Dowty Communications, Inc. v. Novatell Computer Sys. Corp., 817 F.Supp. 581, 585 (D. Md. 1992) (describing two ways of evaluating failure: (1) comparing actual breach to potential breaches envisioned at time of contract, or more commonly (2) evaluating compliance with limited remedial responsibilities).

Although there is evidence of the questionable sufficiency and protracted duration of Plaintiff's efforts to repair well-alleged and evidenced subcontract construction defects, the Court retains reservations regarding whether the circumstances of the case *sub judice* meet this standard given the evidence of record as to Defendants' conduct as well as Plaintiff's. *See, e.g.*, *supra* at 5, n. 2; Plaintiff's Memo of Law at 6, ECF No. 202 (discussing evidence

and admissions regarding Defendants' exclusion of 84 Lumber from project sites).[7] *Cf.*

Patapsco, 276 F.Supp.2d at 474-5 (concluding evidentiary record of three months' delay and

continued defects following repair was insufficiently developed to determine failure of

essential purpose).[8] However, here, as in <u>Patapsco</u>, the Court need not make a determination

on this question because it predicts, as did the District Court in <u>Patapsco</u>, that even if 84

Lumber's conduct and the course of events construed in the light most favorable to

Defendants were sufficient to render the parties' repair and replacement provision

unenforceable for failure of its essential purpose, the parties' other contractual damage

limitations provisions are, under Maryland law, independent. *See* <u>id.</u> at 476 (assuming failure

of essential purpose *arguendo*).

    This case does not arise under the Uniform Commercial Code ("UCC"), but is, as

Defendants note, a mixed goods and services case with a primary services component.[9]

Nonetheless, the UCC is itself a reflection and codification of the "law merchant", *i.e.*, the

---

[7] *See also* Plaintiff's Memo of Law at 7, ECF No. 202, quoting Riegel Power Corp. v. Voith Hydro, 888 F.2d 1043, 1046 (4th Cir. 1989) (noting that repair and replacement clause in contract for specialized/customized goods may impose requirement of seller's "best efforts"). The Court rejects Plaintiff's assertion that Defendants' sale of some units "provides sufficient indicia" that the buildings were in "working condition", evidences Plaintiff's "best efforts", and is therefore dispositive of the failure of essential purpose question in Plaintiff's favor. Id.

[8] Plaintiff's assertion that the repair and replacement provision has not failed of its essential purpose because "[a] contractor could make repairs to the alleged defects today and Defendants could sell the properties . . .", Plaintiff's Memo of Law at 8, ECF No. 202, is questioned by this Court for reasons discussed in the prior Status Conference, including the amount of time passed in litigation. *Cf.* Patapsco, *supra* (noting delay of three months and question of failure of essential purpose).

[9] *See also* Plaintiff's Memo of Law at 5, n. 1, ECF No. 202 ("The UCC applies to transactions in goods as well as transactions in services and goods if the predominant purpose of the contract is for the sale of goods with services incidentally involved.").

rules, customs and usages generally recognized and applicable to commercial/mercantile transactions.[10]  And the broader presumption underlying and referenced in the analysis of relevant cases decided under the UCC (*i.e.*, a State's adoption thereof) is that the failure of essential purpose of a repair or replacement provision does not invalidate a proscription against consequential damages because "sophisticated business entities" may want to allocate unknown or undeterminable risks and "should be free to allocate [them] as desired, provided the waiver is not unconscionable."  Patapsco, 276 F.Supp.2d at 477 (predicting that under Maryland law set forth in its adoption of the UCC, limitation on damages did not fail if repair and replacement provision failed of essential purpose, and granting motion to dismiss counterclaim for consequential damages); id. (noting that Comment to relevant subsection of Maryland's UCC (allowing contractual exclusion of consequential damages) "recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner" and that "such terms are merely an allocation of unknown or undeterminable risks").  *See also* Eastman Chemical Co. v. Niro, Inc., 80 F.Supp.2d 712, 721 (N.D. Tex. 2000) (quoted in Patapsco) ("It would largely undermine the liberty of business entities to allocate . . .  commercial risks as they see fit to make the validity of a freely negotiated consequential loss waiver . . . dependent on the success of a quite distinct contractual provision . . . .").[11]

---

[10] *See* Defendants' Memo of Law at 6, ECF No. 201 (explaining that UCC cases are relevant where "the factors courts consider" in a legal determination "are the same under Maryland (and other states) common law and the UCC").

[11] *Cf.* Potomac Electric Power Company v. Westinghouse Electric Corp., 385 F.Supp. 572, 575 (D.D.C.1974), reversed and remanded on other grounds, 527 F.2d 853 (D.C.Cir.1975) (concluding that clauses restricting remedies to repair and replacement and limiting liability were

This case also does not arise under the Maryland Uniform Computer Information Transactions Act ("MUCITA"), which "specifically reverses the UCC presumption" in favor of the parties' consequential damage limitations. Compare Baney Corp. v. Agilysys NV, LLC, 773 F.Supp. 2d 593, 606 (D. Md. 2011) (differentiating UCC and following MUCITA's express statutory language in finding that failure of exclusive remedy makes limitation of consequential or incidental damages unenforceable unless agreement expressly provides that the limitation is independent of the remedy). Neither the inapposite Baney decision nor any other authority cited by Defendants presents any reason the law merchant, *i.e.*, standard accumulated commercial practices law, should be disregarded in this mixed services case. Defendants have made no showing of a different expectation between these sophisticated commercial parties.[12]

Defendants more aptly cite a well-written case decided by the Fourth Circuit in 1985 and concluding that contractual language excluding consequential damages in the sale of a tractor was inapplicable to longer-term consequential damages for a duration of several years - beyond reasonable repair and replacement. Waters v. Massey-Ferguson, Inc., 775 F.2d 587, 591 (4th Cir. 1985) (examining contract "through the specific light of its written context, its creative context, and its commercial context"). The Court observes, however, that the decision expressly limited its holding both to a prediction of South Carolina law and to the

---

valid and enforceable "[w]ithin the framework of [the] commercial transaction" and "also consistent with Sections [of the UCC]").

[12] *Cf.* Defendants' Combined Statement of Material Facts at 2, ECF No. 153 (indicating that between 1996 and 2008, Defendants generated over $60 Million in residential and commercial construction project revenue, Mortimer directly managed over 500 employees, and Defendants maintained successful financial relationships with multiple banking institutions with $30 million in borrowings fully repaid).

particular contract before it, "advanc[ing] no general opinions about the enforceability of another warranty . . . ." Waters, 775 F.2d at 593. Waters was duly distinguished in the District of Maryland's Patapsco decision, s*ee* Patapsco, 276 F.Supp.2d at 477, n. 4, and those distinctions apply here as well. In Waters, the parties' contract evidenced their confident presumption that any flaw in the tractor sold could and would be repaired. Id. (discussing premise that "warranty foresaw only repair" and the case-specific reasonableness of that premise). Unlike Waters, where the warrantor, Massey-Ferguson, designed the product and had extensive experience in and dedicated facilities for routine tractor repair/restoration, here the warrantor, 84 Lumber, was adapting its services to the design/specifications of the controlling general contractor, Mortimer. *See* id.; *see also* Plaintiff's Memo of Law at 7 ("84 Lumber completed subcontract work at Defendants' direction and based on on Defendants' unique requests and specifications."); id. at 11-12, ECF No. 202 (distinguishing Waters). *Cf.* Patapsco, 276 F.Supp.2d at 478 (noting "modern trend of jurisprudence" reflected in majority of jurisdictions' determinations "that a waiver of consequential damages can be valid notwithstanding the fact that a limitation of remedy has failed of its essential purpose") (citing Riegel Power, 88 F.2d 1043); Plaintiff's Memo of Law at 9-10, ECF No. 202 (string citing cases).

The Court further notes, in concluding this portion of its analysis, that an independent reading of these provisions follows most reasonably from the parties' chosen terms. Paragraph 15 first limits 84 Lumber's obligation to repair or replacement, *i.e.*, this provision itself precludes entitlement to any other forms of relief/damages for work or material defect claims. And paragraph 15 next provides that "in no event" will 84 Lumber be subject to "any consequential, . . . damages of any type in connection with any claim under this paragraph."

Thus, under the parties' own language the second provision comes into play upon some failure of the operation of the foremost "repair or replacement" term.  *See* Dowty, 817 F. Supp. at 585 ("The contractual language . . . creates a two-tiered limitation on [seller]'s potential liability.  On the first level, [it] is limited to the cost of repairing or replacing nonconforming [merchandise] . . . .  If that limitation were deemed to be not effective, the second level operates to preclude [buyer] from recovering incidental, consequential [and other] damages . . . ."); *Cf.* Patapsco, 276 F.Supp.2d at 474-5 (quoting second provision excluding consequential damages "regardless of whether such liability arises in contract, tort or otherwise" as "serv[ing] as a more general cap on the amount and type of damages [buyer] could recover for any reason").[13]

## B.  <u>Survival of Prohibition Against Consequential Damages Under Unconscionability Standard and Defendants' Other Asserted Grounds for Forfeiture</u>

The next step in the analysis, then, is to measure survival of the parties' contractual limitation against consequential damages under the applicable standard.  Under Maryland law, an "unconscionable agreement" is defined as one that no sane-witted, undeluded person would make on the one hand, and no honest and fair person would accept on the other.  *See* Patapsco, 276 F.Supp.2d at 478-9 (quoting Schrier v. Beltway Alarm Co., 533 A.2d 1316 (Md. App. 1987) (quoting <u>Earl of Chesterfield v. Janssen</u>, 28 Eng. Rpr. 82 (1750))); id. at 479 (concluding that exclusion of consequential damages was not unconscionable where it did not involve unfair

---

[13] The Court concurs with Plaintiff's objections to Defendants' assertion that the proximity of the damage provisions in paragraph 15 "confirm[s] that the only reasonable reading of the bargain made in this paragraph is that the damages limitations are imposed in exchange for the guaranty."  *See* Defendants' Memo of Law at 4, ECF No. 201; Plaintiff's Memo of Law at 2-3, ECF No. 202 (observing that Defendants proffer no evidence of an isolated exchange of consideration as to these contract provisions).

surprise or oppression).  *See also* Leet v. Totah, 620 A.2d 1372 (Md. 1993).[14]

The Court first notes that Defendants' assertion of unconscionability is being made by a commercially sophisticated party with extensive experience as a general contractor, who was subcontracting residential development construction. *See, e.g.*, Dowty, 817 F. Supp. at 589 (noting, in opening analysis of unconscionability, that "the transaction between [the parties] was commercial in nature, involving sophisticated business entities" and thus "the terms of the [contract] are presumptively valid") (citing Flow Industries, Inc. v. Fields Const. Co., 683 F. Supp. 527, 531 (D. Md. 1988)).  Defendants define unconscionability as "extreme unfairness" evidenced by "(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party"; and they appear to acknowledge the merit of their assertion of unconscionability by the two substantive sentences they devote to it.  *See* Defendants' Memo of Law at 11-12, ECF No. 201 (quoting Walther v. Sovereign Bank, 872 A.2d 735, 743 (2005)).

_____

[14]  The Court in Leet (a real estate – non-UCC – case) first noted the defendant's "principal reliance" on Maryland Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena, 386 A.2d 1216, 1231 (Md. 1978) ("Unless clearly prohibited by statute, contractual limitations on judicial remedies will be enforced, absent a positive showing of fraud, misrepresentation, overreaching or other unconscionable conduct . . . ."). 620 A.2d at 660.  It went on, however, to uphold the contractual limitation, by the following analysis:

> Assuming, *arguendo,* that the doctrine of unconscionability may even be applied to a damage limitation clause in a contract between [two sophisticated businessmen], the subject contract is not unconscionable. *Guidance as to Maryland public policy relating to unconscionable contracts, or clauses in contracts, can be found* in § 2–302(1) of the Uniform Commercial Code, relating to the sale of goods. Md.Code (1975, 1992 Repl.Vol.), § 2–302(1) of the Commercial Law Article (CL). The official comment to that section points out that *"[t]he principle [of unconscionability] is one of the prevention of oppression and unfair surprise . . . ."* Against the background of this transaction, the Remedies Limitation Clause reflects neither . . . .

Id. (emphasis added)

To be equally succinct:  The consequential damage limitation is not procedurally unconscionable; the contract in question is not a consumer contract, is not addressed to an unsophisticated party in need of assistive bolding or font size or other indication of provisional importance, and is not unclear as to the scope of its limitation.  Nor is the limitation substantively unconscionable; the general contractor has made no proffer that he had no absence of choice of other subcontractors to hire or limitation on his freedom to contract, and the contract condition of which Defendants complain as objectively "unreasonable" in fact reflects a very common allocation of risk (the amount of which is often in the control of the purchaser,  so it is not surprising that the provider of services would want to limit its liability to an amount within its contemplation) in a manner that eliminates potentially complex damage calculations.

In addition to asserting unconscionability, Defendants also assert (again, fairly briefly) that 84 Lumber has forfeited the limitations against consequential damages by acting in bad faith and/or by work defects so pervasive that they constitute a total and fundamental breach of the contract.  Defendants' Memo of Law at 10-11, ECF No. 201.  Defendants' assertions of estoppel based on 84 Lumber's "bad faith with respect to its guaranty that it would repair or replace any defective work" is simply a recharacterization or relabeling of the failure of essential purpose argument addressed by the Court, *supra*.  The argument that sufficiently egregious performance/implementation of a repair or replacement remedy can preclude the seller/warrantor's reliance on other contractual damage limitations is just another way of asserting that the clauses are dependent, which the Court has concluded they are not.  Similarly, Defendants' assertions of estoppel based on an asserted "fundamental breach" - *i.e.*, workmanship flaws so pervasive and subcontract performance breaches of such a fundamental character  as to vitiate contractual damage limitations - is likewise a repackaging of failure of

essential purpose. Defendants' assertions go directly to issues of construction defects and delays/failures in repair and replacement which, as the Court holds *supra*, do not provide independent grounds for striking the parties' contractual preclusion of consequential damages. *Cf.* Dowty, 817 F. Supp. at 589 (concluding that remedy did not fail of essential purpose; "for the sake of completeness" then "not[ing] again that the distinction between types of contractual limitations on remedies must be maintained" such that "repair, replace or refund" remedy was separate from "restriction on consequential damages"; and further noting – after completing analysis of absence of "unconscionability" under Maryland law – that "[a]nother approach some courts have taken in approaching the effectiveness of a contractual limitation consequential damages is to focus on the magnitude of the breach"); id. at 589-90 & n. 7 (discussing "total and fundamental breach" analysis of two Ninth Circuit cases and distinguishing between that in which performance was not as promised and that in which buyer "received [literally] nothing"; concluding that partial performance "prevent[ed]" the breach "from being 'total and fundamental'")). [15]

The only colorable argument raised by Defendants is that of fraud in the inducement. *See* Defendants' Memo of Law at 10-11, ECF No. 201 (asserting that Plaintiff cannot rely on contractual damages limitation if established to have (a) "fraudulently induced Mortimer into entering" the Subcontract Agreements or (b) "acted fraudulently" by misrepresenting that it "would correct" and "had in fact corrected all construction defects"); id. (citing Dowty, 817 F.Supp. at 590 (citing Am. Elec. Power Co. v. Westinghouse Elec. Corp., 418 F.Supp. 435, 460

---

[15] The Court observes that it is undisputed that Defendants received some benefit of partial performance under the Subcontract Agreements. *Compare* S.M. Wilson & Co. v. Smith International, Inc., 587 F.2d 1363, 1375 (9th Cir. 1978) *with* RRX Industries, Inc. v. Lab-Con, Inc., 772 F.2d 543 (9th Cir. 1985).

(S.D.N.Y. 1976) for proposition that limitation of consequential damages cannot be effective if claims of fraudulent inducement are sustained at trial)).[16]

Both parties have, however, neglected the line of Maryland cases which make clear that a party discovering fraud during the course of contract performance is required to elect rescission or ratification at the time; and a party failing to timely elect rescission retains its right to damages for deceit but is precluded from subsequently asserting fraudulent-inducement rescission. *See, e.g.,* Sonnenberg v. Security Management Corp., 599 A.2d 820 (Md. App. 1992) (holding that real estate purchasers who became aware of fraud in material facts between executing purchase contracts and closing on property, were in communication with seller, and elected to close, were not precluded from claim for deceit but could "recover damages for the fraud in lieu of rescission"); id. at 823 (noting that Maryland is in accord with majority rule that "where the defrauded party has in part . . . performed the contract at the time of discovering the fraud, he may go on with performance and also recover or have the appropriate allowance of damages").[17]

As the Court of Appeals of Maryland has further explained:

> Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the

_____

[16] The Court rejects Defendants' assertion of Plaintiff's forfeiture of the limitations on consequential damages by fraud in the performance based on its repair or replacement conduct. This argument amounts, like others rejected *supra*, to a recharacterization of the assertion that sufficiently egregious conduct under that contractual provision vitiates the other. *See* discussion, *supra*. The Court notes, therefore, its prediction that the Court of Appeals of Maryland would not adopt fraud in the performance as a ground for negating a consequential damages exclusion. In contrast, to the extent that fraud in the inducement vitiates a contract, it would *a fortiori* vitiate its damage limitation provisions.

[17] *See also* View Point Medical Systems, LCC v. Athena Health, Inc., 9 F.Supp.3d 588, 612 (D. Md. 2014) ("'In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive.' Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 3.92, at 346 (5th ed.2013)"); id. (quoting Sonnenberg, *infra,* as to requirement of decision).

contract or to ratify the contract and seek damages, either affirmatively or by recoupment. [citations omitted] Failure promptly to rescind does not preclude other remedies for fraud in the inducement. The defrauded party, in effect, must elect between inconsistent and mutually exclusive rights. The party is 'put to the choice of repudiating or ratifying . . . . If he adopted the first alternative he repudiated the conveyance and sought its rescission and a restoration of his situation before the contract; but if he chose the second, he ratified . . . but could obtain *damages to redress the injury inflicted by the false and fraudulent representatio*n.'

Id. at 824 (emphasis added) (quoting *Telma v. Gingell,* 146 A. 221, 222 (1929)).

Thus, while timely rescission of the fraudulently-induced contract is not the only relief, and the injured party may prosecute an action for the tort of deceit, the damages to which he is entitled are those "redress[ing] the injury inflicted by the false representation", *i.e.*, those flowing from the relevant fraudulent misrepresentation itself rather than from entry into the contract. Id. at 815 (quoting *Sommers v. Dukes,* 118 A.2d 660 (1955), *later proceeding,* 135 A.2d 419 (1957)) (concluding, where defendant misrepresented application of payments to fire insurance policy, that plaintiffs "should be put in the same position as if [payments had been made and] the insurance had been in effect").

Indeed, the Court of Appeals of Maryland noted and elaborated on its holding in Sonnenberg, the following year:

[I]n *Sonnenberg v. Security Management Corp.,* 325 Md. 117, 599 A.2d 820 (1992), . . . we held that settling on a contract . . . after acquiring full knowledge of the facts does not, as a matter of law, vitiate the purchaser's reliance on the seller's misrepresentation which induced the formation of the contract. We pointed out that consummation of the contract was, in effect, an election of remedy; the purchaser forgoes his or her right to rescind the contract in favor of damages for deceit. We noted, moreover, that, notwithstanding that its importance became apparent only after the fact, the relationship between the misrepresentation and the claimed loss is a question of fact.

In this case, the petitioners learned of the false statements which they claim induced them to contract for the purchase of their house after the contract was

executed, but before settlement. They alleged, however, that that misrepresentation, and those that depended upon it, induced them to change their position, with the result that they suffered losses. Thus, *they contend that there was a causal relationship between the misrepresentations and their claimed loss, i.e. the falsity of the statement did not become apparent until after they had sold their former residence, rented temporary housing accommodations, enrolled their children in new schools, and commenced transporting them to those schools.* Whether there is such a causal relationship, the petitioners maintain, clearly constitutes a genuine dispute of material fact.

Gross v. Sussex, Inc., 630 A.2d 1156, 1168 (Md. App. 1993) (citations omitted) (emphasis added).[18]

In other words, to the extent that Defendants may be able to proffer *prima facie* evidence of fraud in the inducement as to any of the Subcontract Agreements, where they are deemed under Maryland law to have ratified each of the contracts by failing to repudiate them upon discovery/reasonable knowledge of the alleged fraud, they are limited to the damages

------

[18]  *See also* Lustein Chev. v. Cadeaux, 308 A.2d 757, 751 (Md. App. 1973) (holding, where seller of automobile misrepresented vehicle's involvement in prior accident, that plaintiff could not recover for fraud or negligent misrepresentation because she had failed to prove that the prior accident proximately caused her damages; "but for" allegation that she would not have purchased vehicle was insufficient); Lavine v. Amer. Airlines, Inc., 2011 WL 6003609, **5-6 (Md. App., Dec. 1, 2011) ("As a general rule, 'one may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the injury.'" *Empire Realty Co. v. Fleisher,* 269 Md. 278, 284, 305 A.2d 144 (1973) (internal citations omitted). In the case of a misrepresentation, 'the plaintiff must show not only that he would not have performed the act from which the injury resulted but for the misrepresentation, but also that the fact misrepresented was the proximate cause of the injury.' *Lustine Chevrolet v. Cadeaux,* 19 Md.App. 30, 35, 308 A.2d 747 (1973). To establish the causal link, the plaintiff must show that there is a reasonable probability or reasonable certainty that the act complained of caused the injury suffered. Mere possibility is not enough. Reasonable probability can be shown by either direct evidence or inferences drawn from surrounding circumstances. *Id.* at 36, 308 A.2d 747."). *Cf.* id. (implicitly rejecting that fraud claim would vitiate contract damage limitation provisions).

proximately flowing from the purported fraudulent misrepresentations themselves (and not those from failure/delay in performance of contractual undertakings).[19]

The law that puts a party to election of rescission or ratification reflects the policy that when a party to a contract has learned he has been misled he cannot sit back and hold the potential claim, treating it as an insurance that the contract may still prove beneficial or, if not, the loss may be transferred to the other party.[20] Under the Subcontract Agreements at issue, the parties agreed that 84 Lumber would provide materials and construction services to a warranted standard. They also agreed upon an allocation of risk such that, even if 84 Lumber's construction services fell short of that standard, any indirect losses sustained by Defendants in consequence would fall on Defendants. In other words, 84 Lumber would not be a guarantor of loss beyond the direct cost of meeting the warranted standard, and other losses incurred by delay or failure of contract performance remained with Defendants – a risk allocation that was presumably reflected in the contract price. In this circumstance, having discovered any misrepresentation comprising fraudulent inducement, Defendants could not allow the continuation of contract execution and hold in their pocket the position that 84 Lumber had now effectively become a guarantor. To the contrary, a party cannot change a material term of the

---

[19] Were there any question as to whether Defendants are deemed to have ratified any of the Subcontract Agreements by failure to elect rescission when they knew or should have known of a claim for fraudulent inducement, it is beyond peradventure that they have ratified said contracts by asserting breach of contract claims in this action. Defendants have made no *ad damnum* request for rescission and have clearly asserted that they are proceeding under the contracts. *See* Defendants' Second Amended Counterclaim, ECF No. 44.

[20] McAleer v. Horsey, 1872 WL 4422, *6 (Md. App. Mar. 19, 1872) ("The appellee is estopped by every principle of good faith from ripping up alleged frauds which he had known of long ago, . . . . . If the appellee knowingly affirmed the contract and took the chances of success he cannot now recover.") (setting forth positions of counsel) (citing 30 *Law Journal,* (*N. S.,*) 4; 1 *Ad. & Ellis,* 40, 41.).

contractual risk allocation *sub silentio*.

Defendants have raised allegations of fraudulent inducement on the basis of Plaintiff's (i) misrepresenting at the time of the 2007 Settlement that no other improper/excessive CCA charges had been or would be made in 2007 when 84 Lumber immediately continued improper charges on the prior residential project, as Mortimer was advised by 84 Lumber employees during August, 2008[21] and misrepresenting in early September, 2008 that an August-early September 2008 internal audit was conducted and showed no improper CCA charges;[22] and (ii) misrepresenting in 2007-2008 that subcontracted work would be performed by 84 Lumber's national "install program" construction experts/specialists when 84 Lumber immediately used workers who were local friends and family of store employees.[23]

The Court notes, in closing its discussion of the scope of potential liability for the tort of fraudulent inducement as to one or more of the Subcontract Agreements on which a claim has been made, that damages resulting from construction defects do not flow from billing/audit misrepresentations. And it reminds the parties of its prior observations related to allegations as to work performance by an "install program" – that the statements alleged are ones of promise,[24]

---

[21] *See supra* at 6 n. 4 (summarizing account in Defendants' Combined Statement of Material Facts at 4-5, ECF No. 153; Defendant's Memo of Law in Opposition to PSJ at 4, ECF No. 156; Defendants' Combined Statement of Material Facts at 12, ECF No. 153).

[22] *See supra* at 6 n. 5 (summarizing Defendants' Combined Statement of Material Facts at 12-13, ECF No. 153).

[23] *See supra* at 6-7 n. 6 (summarizing Defendants' Combined Statement of Material Facts at 5-6, ECF No. 153; Defendant's Memo of Law in Opposition to PSJ at 4, ECF No. 156).

[24] *See* Summary Judgment Memo at 5, n. 6, ECF No. 166 ("The Court observes that statements which constitute promises of future performance differ from those which constitute representations of existing fact. *See* discussion, *infra*, *e.g.* fn.13; Section IV.C.").

and are of promise not reflected in Subcontract Agreements which otherwise expressly provide for workforce standards, *i.e.,* indicating that the sophisticated business parties knew how to include such contract terms.[25] Finally, the Court directs the parties' attention to the execution date of the first Subcontract Agreement in April, 2008, Defendants' assertion that construction performance by friends/family of local store employees was "immediate"; the record indicia of Defendants' familiarity/relationships with numerous local store employees and duration/extent of its residential/commercial construction projects and related business dealings with said local store; and the late August 2008 through late October 2008 execution dates of the other four (4) Subcontract Agreements. The Court therefore notes, without deciding herein, a substantial question as to colorability of any claim that Defendants entered the Subcontracts in reasonable reliance on a workforce representation.

For the reasons set forth above, the contractual consequential damage limitation provisions at issue stand as to those claims encompassed by their language, *i.e.*, those related to "defects in workmanship or materials" and the damages flowing therefrom. The Subcontract Agreement damage limitation is, however, inapplicable (a) to any damages from asserted breach of the 1997 CCA (Count IX)[26] or (b) under Defendants' established fraudulent-inducement misrepresentation claims, if any, damages proximately flowing from said misrepresentation(s). *See supra* (delineating claims). And, as noted below, the Subcontract Agreement consequential damage limitations do not exclude direct damages under the contract for defects or delays in

---

[25] *See* <u>id.</u> at 10-11, n. 16 ("The Court observes that the only provision specifying particular qualifications of the subcontractor laborers appears with regarding to decking, which requires that all work 'be performed by trained and experienced personnel. . . . . The Court also notes the facts of record regarding the duration and scope of Mortimer's experience in residential construction.").

[26] *See supra* at 6, n. 3.

performance.

## C. Lost Profits as Within Contractual Limitation of Damages

Defendants assert that "even if the damages limitation provision stands, lost profits are available because they are not expressly excluded and the language is ambiguous . . . ." Defendants' Memo of Law at 2, ECF No. 201. In support of this position, Defendants make three arguments:

First, Defendants contend that "to reach this conclusion the Court need only to review the contortions that 84 Lumber is now going through to argue that the consequential damages language applies to all claims". Id. at 13. However, the fact that a party may urge an overbroad interpretation does not render contractual language ambiguous. Ambiguity is an objective standard based on a reasonable interpretation, rather than upon the parties' litigation positions. *See* Plaintiff's Memo of Law at 17-18, ECF No. 202.

Second, Defendants contend that "[u]nder Maryland law, lost profits is an uncertain term, because they can be both "general damages" and "special [or consequential] damages". Id. (citing CR-RSC Tower I, LLC v. RSC Tower I, LLC, 429 Md. 387, 408, 56 A.3d 170, 182 (2012)). However, the Maryland Court of Appeals proceeded to resolve the claimed uncertainty in the very passage cited:

> There is some uncertainty over which category applies to lost profits claims. . . . [T]his is because the word "profit" can refer either to business profits or the increase in value of an item. In the former instance, when lost profits are claimed for lost income from business operations that would have been made but for the breach, the claim is for "consequential" or "special" damages. In the latter instance when the lost profits claim is based on the value of the item promised, the claim is for "general damages," as the damages are "the difference between the contract price and the fair market value at the time of breach."

Id. (citations omitted).  *See also* Plaintiff's Memo of Law at 19, ECF No. 202.  Under the Tower

analysis, to the extent Defendants seek damages for profits their real estate business might have

made but for 84 Lumber's defective and delayed services, that constitutes a claim for

consequential damages, and is barred by the damages limitation provision.  On the other hand, to

the extent Defendants seek to recover the value of the thing promised, that is equivalent to a

claim to for the value of repair or replacement under the warranty, which is not barred by the

damages limitation provision.  Whether Defendants choose to refer to the latter claim as a claim

for "lost profits" is of no moment.

Third, Defendants contend that the asserted ambiguity of the term "consequential damages"

is confirmed by the fact that "in nearly every case discussing whether a consequential limitation

applies, the clause at issue specifically excluded lost profits, *expressly defined lost profits as*

*consequential damages*, or both."  Defendants' Memo of Law at 14, ECF No. 201 (emphasis

added).  Commonly-used contract terms are not rendered ambiguous merely because some (or

many) draftsmen choose to illustrate their scope with examples.  Defendants' position might

entail the problematic result that a limitation on consequential damages that fails to list every

illustrative example would be ambiguous as to any application not listed.  The courts have not

generally found such limitations to be ambiguous.  Moreover, it appears to the Court that

numerous instances of commercial parties expressly listing lost profits as an example of

consequential damages - rather than tending to create ambiguity - indicates that lost profits are

commonly understood to constitute consequential damages, whether so listed or not.[27]

---

[27] *See, e.g.*, Waters, 775 F.2d at 592 ("In no event shall the owner be entitled to recover for
incidental, special or consequential damages such as . . . loss of profits or revenue . . . .")

_____

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Counsel of record                    Dated: October 11, 2016