**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| 84 LUMBER COMPANY, L.P. | ) | |
| | ) | Civil Action No. 11-548 |
| Plaintiff/Counter-Defendant | ) | |
| | ) | Magistrate Judge Lisa Pupo |
| v. | ) | Lenihan |
| | ) | |
| GREGORY MORTIMER BUILDERS, | ) | ECF No. 234 |
| *et al.* | ) | |
| Defendants/Counter-Plaintiffs | ) | |


**MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 52(c)**


**I.      SUMMATION**

For the reasons set forth below, the Court will grant Plaintiff's Motion for Judgment Pursuant

to Federal Rule of Civil Procedure 52(c), ECF No. 234, as Defendants have failed - in their

pleadings and evidentiary filings, and through evidence and argument  presented during the

limited-issue bench trial held on November 1st and 2nd, 2016 (the "Bench Trial")[1] – to meet the

requisite evidentiary standards for a *prima facie* showing of the element of reasonable reliance as

to any of their counterclaims sounding in fraud or negligent misrepresentation .  In so holding,

the Court observes that it has granted Defendants great leeway in continuing judicial

consideration of these counterclaims, including, *e.g.* (a) conditionally accepting - in the interest

---

[1] *See generally* ECF No. 230-231 (Notices of Filing of Official Transcripts).

of efficiency and economy, in hopes of advancing the parties' understanding and resolution of this protracted litigation, and for purposes of the limited-issue bench trial – all *other* elements of fraud or negligent misrepresentation despite current serious inadequacies in the evidentiary record and, indeed, evidence suggesting the unlikelihood of their ultimate establishment; and (b) considering claims and last-minute theories of tort liability despite significant questions of waiver and/or estoppel. At bottom, no matter how vigorously or inventively Defendants may rub the brass lamp of their residential-development relationship with Plaintiff, tort liability is not a genie which can be summoned by incanting even egregious breaches of contract; nor is it one whose scope of recovery may be attained without reasonable reliance, as it is just that reliance which must supply the causation element in a misrepresentation cause of action.

## II.    <u>RELEVANT FACTUAL AND PROCEDURAL HISTORY</u>

The extensively documented factual and legal history in this case arising from disputes between the parties with regard to (a) construction material purchases and (b) sub-contracted construction of housing in Defendants' multi-duplex residential developments – Timberlake Village (hereafter "Timberlake") and Cedar Creek – located near Deep Creek Lake, in Garrett County, Maryland was most recently summarized by this Court in its October 11, 2016 Memorandum Opinion on Contractual Damage Limitations (the "Damage Limitations Opinion"), ECF No. 214.

The determination of Defendants' ability to make out the elements of their tort-based counterclaims was rendered more critical to the parties' accurate assessment of their litigation positions by this Court's October 11, 2016 Opinion. In the Damage Limitations Opinion, ECF No. 214, and subsequent January 3, 2017 Order, ECF No. 237, this Court concluded that the

parties' contractual limitation of damage provision of the Subcontract Agreements' Paragraph 15, was an enforceable and independent provision, precluding "any consequential, indirect, exemplary or punitive damages of any type" as to those contract claims encompassed by the parties' clear language, *i.e.*, damages "under this paragraph" and therefore those claims related to/flowing from "defects in workmanship or materials."[2] *See* ECF No. 214 at 1-2, ECF No. 237.[3]

---

[2] The Court again notes that the Damage Limitations Opinion addressed contractual damage limitations, and their applicability to breach of contract claims. *See* ECF No. 214 at 2 ("[T]he limitation provisions remain enforceable *as to those contract claims* encompassed by the parties' clear language . . . .") (emphasis added). That is, the Opinion addressed the issues raised for and in the pertinent briefing. It was not revisiting or revising prior determinations, such as its prior denial of Plaintiff's Damages Motion, ECF No. 144, on grounds including rejection of Plaintiff's contention that "parties to whom Plaintiff may be liable under the pending claims are not entitled to consequential, exemplary, punitive, or compensatory damages . . .". *See* Memorandum Opinion on the Parties' Multiple Motions and Cross-Motions for Summary Judgment, ECF No. 166 at 26-27; id. at n. 26 (contrasting Plaintiff's Damages Motion, "asserting that because the Subcontract Agreements state that 'in no event' is 84 Lumber liable for any damages other than repair or replacement costs, Defendants are constrained from other damages under fraud or any other civil theory of liability", with ECF No. 166's discussion of interpretation and "non-applicability to remaining potential tort liabilities"); id. ("The Court again directs the parties to the actual language of Paragraph 15, which expressly limits 'liability hereunder' to the 'extent of 84's negligence' and its obligations to 'repair or replacement of any defective or nonconforming [w]ork' and precludes 'any consequential, indirect, exemplary or punitive damages of any type in connection with any claim under this paragraph.'" ). *Compare* Defendant's Brief in Opposition to Plaintiff's Motion for Reconsideration, ECF No. 232 at 17 (asserting that the language "in no event", contained in contract Paragraph 15, effectively rendered "the limitation of damages" provisions of Paragraph 15 "applicable to the entire Agreement"), id. at 21-23 *with* Damage Limitations Opinion, ECF No. 214, at 2, 12-13, 22.

[3] Defendants' Motion to Reconsider the Memorandum Opinion on Contractual Damage Limitations, ECF No. 225, was recently denied by this Court. *See* Order, ECF No. 237.

In support of that Motion, Defendants asserted as breaches of contract new factual allegations included during the November, 2016 Bench Trial and in Defendants' later Memorandum in Opposition to Judgment, ECF No. 238, as fraud/negligent misrepresentation torts. *See* Defendants' Supplemental Memorandum of Law in Support of Motion to Reconsider, ECF No. 229, at 3 (asserting new theories of liability - stemming from factual allegations of Plaintiff's failure to "provide competent supervision . . ., proper insurance . . . and a site superintendent" -

As explicated in previous Opinions, Defendants' Second Amended Counterclaim, ECF No. 44, theories of tort liability were:

(a) claims by each of the Defendants for (i) unspecified negligent misrepresentations (implicitly and by incorporation those misrepresentations made to Mortimer and underlying Count I), and (ii) fraud/intentional misrepresentation/concealment expressly with regard to Summer, 2009 representations to Mortimer regarding faulty construction issues and Plaintiff's intent to correct/purported correction of them (Counts II and III, respectively);[4] and

---

as providing grounds for a holding that "paragraph 15's consequential damages limitation does not apply to [Defendant]'s *claims for breach of contractual obligations* outside the scope of paragraph 15's warranty") (emphasis added). The Court determined it unnecessary to address the issue of waiver. It concluded that "assuming any breach of contract as now alleged – the nexus between it and any possible harm to Defendant under the contracts would be a defect/delay in materials or workmanship that could have been prevented, ameliorated, or cured. That is, Paragraph 15's limitation of damages addresses – as contractual damage limitations do - the harm for which Plaintiff is liable, not the conduct. As Defendant has specified no new breach of contract claim outside the scope of Paragraph 15, the Court will not issue an advisory order . . . ." ECF No. 236 at 9-10.

*See also, infra* n. 8 (noting Defendants' Amended Pretrial Statement , ECF No. 224, stating that "misrepresentation alleged is as to the work force, and the contractual obligations alleged are as to supervision and workmanship guarantees"); Defendants' Combined Statement of Material Facts, ECF No. 153 (asserting material breach of contracts "by failing to provide competent supervision as required by General Condition 1" and following with subparagraph listings of the resultant construction defects at each unit); further discussion, *infra*.

[4] *See* Damage Limitations Opinion, ECF No. 214, at n. 2 (quoting Defendants' Combined Statement of Material Facts, ECF No. 153, at 20 (stating that in Spring and Summer 2009, Mortimer received "numerous reports of leaks at units at both Timberlake and Cedar Creek" and notified 84 Lumber, and that Mortimer "retained multiple engineers and construction professionals to investigate the issues", made written demands for repair and 84 Lumber "repeatedly represented that [it] would correct all construction defects"); id. at 21 (recounting that in August through mid- September, 2009 84 Lumber retained other construction contractors to investigate and repair the defects and falsely represented they were corrected); id. at 22 (continuing chronology with assertion that "[d]espite the numerous leaks and other defects apparent at that time" Mortimer paid Plaintiff in full for the subcontracts on Buildings 8 and 12, but withheld subcontract payments on other buildings)). *Cf.* Defendants' Memorandum of Law in Opposition to Partial Summary Judgement ("Defendants' Memo of Law in Opposition to PSJ"), ECF No.

(b) claims by Mortimer for fraud in the inducement (Count I) by both (i) misrepresenting that improper CCA charges made in 2007 by a subsequently-fired Maryland manager would not recur[5] and that a Fall 2008 internal audit was conducted and showed no improper CCA charges,[6]

---

156, at 6 (asserting that Plaintiff's "August and September 2009" multiple representations that it corrected and would correct all construction defects were false).

[5] *See* Damage Limitations Opinion, ECF No. 214, at n. 4 (quoting Defendants' Combined Statement of Material Facts, ECF No. 153, at 4-5 ("Following the execution of the settlement agreement, [84 Lumber employees] verbally represented to Mortimer that there were no other improper charges to [the CCA] account and that there would be no further improper or excessive charges to [it].")); Defendants' Memo of Law in Opposition to PSJ, ECF No. 156, at 4 ("[These] representations . . . . were . . . false in that immediately following the settlement agreement and the representations, 84 continued to improperly charge Mortimer's account on the [prior] residential] project.")). *See also* Defendants' Combined Statement of Material Facts, ECF No. 153, at 12 *("*During August 2008, before Mortimer executed the Subcontractor Agreements for Timberlake Building 11 and Cedar Creek Buildings 1 & 2, 84 Lumber employees informed Mortimer that 84 Lumber . . . was manipulating inventory and intentionally overcharging, double-billing and failing to properly credit his account."). *Cf. generally*, ECF No. 230 & 231 (Mortimer's Bench Trial testimony regarding multiple conferences with Plaintiff during early construction and thereafter to review invoices and obtain credits); discussion *infra*.

[6] *See* Damage Limitations Opinion, ECF No. 214, at n. 5 (quoting Defendants' Combined Statement of Material Facts, ECF No. 153, at 12-13 (recounting that on notice from 84 Lumber employees, "Mortimer then informed 84 Lumber representatives [and] questioned certain invoices . . . . In early September 2008, [Mortimer met with 84 Lumber representatives who informed him] the Store Manager . . . . had been fired for theft, . . . 84 Lumber had investigated Mortimer's account . . . [and the] audit did not show any wrongful billing or manipulation of his account"); id. ("On October 1, 2008, Mortimer [received correspondence from Plaintiff stating that an audit of the Maryland store] did not reveal any manipulation of either the quota system or inventory [or] any misuse of the invoicing system")).

*See also id.* (quoting ECF No. 153 at 14 (stating that Mortimer relied upon 84 Lumber's false and misleading assurances that no improper billing or manipulation of his account had occurred [and] would not have executed the Subcontractor Agreements for Timberlake Building 11 and Cedar Creek Buildings 1 & 2 without these representations) and observing the execution dates of these contracts, as well as that for Timberlake Building 12, *i.e.*: the first Subcontractor Agreement was executed in April, 2008 (Timberlake #8); the second (Timberlake #12) *in late August, 2008*; and the additional three (3) in late October, 2008. The Court observes again that the "late August, 2008" Subcontract Agreement and its relation to an asserted CCA misbilling audit misrepresentation claim was noted to Defendants in the Court's Damage Limitations Opinion.

and (ii) misrepresenting that subcontracted work would be performed by 84 Lumber's national "install program" construction experts/specialists.[7]

And these claims remained as set forth above throughout subsequent pleadings, including, *e.g.*, Defendants' October 18, 2016 Amended Pretrial Statement, ECF No. 224[8] and Amended

---

[7] *See* Damage Limitations Opinion, ECF No. 214, at n. 6 (quoting Defendants' Combined Statement of Material Facts, ECF No. 153, at 5-6 ("In 2007 and 2008, 84 Lumber represented to Mortimer that it had experienced and skilled construction experts and specialists that were capable of constructing homes of the type Mortimer intended to build at Timberlake and Cedar Creek . . . . 84 Lumber represented to Mortimer that these construction workers were part of 84 Lumber's "in-house" install program . . . ."); Defendant's Memo of Law in Opposition to PSJ, ECF No. 156, at 4 ("84 Lumber's representations regarding the skill and quality of the workers it intended to use at [Defendants'] projects were . . . false in that the workers used immediately on Mortimer's projects following the representations were . . . local friends and family of 84 Lumber local store employees.")). *See id.* (quoting Defendants' Combined Statement of Material Facts, ECF No. 153, at 6 ("In reliance on 84 Lumber's representations regarding the skill and quality of its 'install program' construction crews, and in reliance on 84 Lumber's representations that there were no further improper or excessive charges to Mortimer's account, Mortimer agreed to expand 84 Lumber's role from supplier to primary subcontractor.")).

[8] Defendants' Amended Pretrial Statement, ECF No. 224, provides, as to the "material facts to be offered at trial", that:

(a) "In 2008, 84 Lumber convinced Mortimer to use its installed sales program by representing it had qualified and skilled construction workers to perform the work. Relying on these representations, Mortimer changed the nature of his relationship with 84 Lumber and executed subcontractor agreements retaining 84 Lumber to construct the entire building shells at Timberlake Buildings 8, 12 & 13. In each of these agreements, 84 Lumber was required to supervise its own employees, to perform all work to meet local building codes and manufacturer's specifications, and guaranteed that it would repair or replace any defective work." *That is, the misrepresentation alleged is as to the qualification and skill of the work force, and the contractual obligations alleged are as to supervision and workmanship guarantees.*

*The Court again notes Defendants' own statements as to the timing, source and extent of their knowledge of the construction workers "immediately" engaged on the first-started (April, 2008 contract) units and their continuation of Subcontract Agreements and entry into others. It further notes Defendants' statement of Plaintiff's contractual supervisory obligation as extending to "its own employees". Defendants make no assertion of a contractual obligation to supervise the project site.*

(b) "During construction, Mortimer learned from 84 Lumber employees that 84 Lumber was still manipulating and overcharging his account. After expressing his concerns to senior 84 Lumber officials, 84 Lumber misrepresented that it conducted an audit of Mortimer's account and misrepresented that there was no manipulation of his account. Relying on these representations, in the fall of 2008 Mortimer executed three more subcontractor agreements, for Timberlake Building 11 and Cedar Creek Buildings 1 & 2."

*The Court again notes Defendants' statements that Mortimer was made aware – by Plaintiff's workers - of alleged overcharges "during August, 2008", communicated his concerns to Plaintiff and requested an audit. The audit was then performed by Plaintiff. Mortimer executed the Subcontract Agreement for Timberlake #12 on August 25, 2008, prior to receipt of any audit result representations by Plaintiff. Defendants attest results were communicated orally in a meeting in September, 2008 and by one-page letter received on October 1, 2008. See* Defendants' Combined Statement of Material Facts, ECF No. 153. *The Court also notes that Mortimer asserts that he executed the October, 2008 Subcontract Agreements in reliance on representations regarding the audit. He makes no such assertion as to the August 25, 2008 Subcontract Agreement although it appears from the evidence that he was aware of misbillings by virtue of both Defendants' own ongoing invoice reviews and allegations communicated by Plaintiff's construction-site employees. It also appears Defendants were in the process of an inquiry with Plaintiff with regard thereto at the time.*

(c) "[D]uring the spring of 2009, Mortimer began receiving complaints about leaks and other defects at both finished and unfinished units. Mortimer asked local 84 Lumber employees to fix the issues, and while 84 Lumber attempted some repairs, it did not cure the defects. Mortimer then escalated his requests to fix . . . . In response, Mortimer received false promises that all defects would be fixed. Relying on these promises, Mortimer began making payments on defective, unfinished units. But 84 Lumber did not repair the units. Instead, it made false representations that there were no more problems at these units . . . . [During 2009 and 2010, despite communications from Mortimer], 84 Lumber failed to correct the defects. . . . In July 2010, Mortimer asked 84 Lumber to send a construction expert to the buildings to diagnose defects and recommend repairs. 84 Lumber refused."

*The Court notes Defendants' Second Amended Counterclaim and Statement of Material Fact allegations of repair misrepresentations in Spring and Summer 2009, statements of the retention of their <u>own</u> construction consultants/experts for the purpose of identifying construction defects and means of repair, ongoing communications with Plaintiff's representatives regarding identification of source and correction of e.g., leaks (i.e., materials vs. installation), and acknowledgment of Plaintiff's attempts at repair and retention of third-party contractors/consultants. Cf. supra* text and n. 4 (quoting Defendants' statements in Combined Statement of Material Facts, ECF No. 153). *The Court notes the distinction between breach of contract and tort. See* discussion, *infra.*

Offer of Proof, ECF No. 222.[9]

As with its detailing of the nature and basis of Defendants' tort claims, the Court has repeatedly recounted its concerns regarding apparent evidentiary insufficiencies as to the elements of these claims. Hence, *e.g.*, the Court's direction that Defendants provide an Offer of Proof, and thereafter an Amended Offer of Proof. Of particular significance, the problematic nature of a showing of reasonable reliance was highlighted by the Court in its Damage Limitations Opinion footnotes on Defendants' factual representations. *See supra* nn. 4-8; *see also* ECF No. 214 at 21-22 (parsing, with reference to previous factually-detailed footnotes, Defendants' basis for alleged fraudulent inducement). Despite the continuing inadequacies of Defendants' Amended Offer of Proof, ECF No. 222, the Court permitted Defendants an opportunity to show reasonable reliance through the presentation of evidence and legal argument during the limited-issue Bench Trial.[10]

---

[9] Defendants' Amended Offer of Proof, (ECF No. 222) at 2, sets forth the tort claims as follows:

> Mortimer's Counterclaim contains three tort counts against 84 Lumber. Count I alleges that 84 Lumber fraudulently induced Mortimer to enter into the Timberlake and Cedar Creek Subcontractor Agreements by intentionally misrepresenting that improper billing was not presently occurring, and would not occur in the future on his account; that 84 Lumber would use skilled crews that were part of its "install program" on the projects; and that after Mortimer raised concerns of improper billing, that 84 Lumber conducted an audit of Mortimer's account that showed no improper activity. Count II alleges that 84 Lumber negligently made these same representations. Count III alleges that in addition to the fraud set forth in Count I, 84 Lumber intentionally misrepresented that it had repaired and would repair all construction defects at Timberlake and Cedar Creek.

[10] In light of this history, the Court was quite surprised by Defendants' recent suggestion that they should be indulged yet another opportunity. *See* Defendants' February 6, 2017 Sur-Reply in Support of Opposition, ECF No. 244, at 3 (asserting that evidence supporting Mortimer's reasonable reliance on alleged supervision representations (a new tort theory), "can

### III.    APPLICABLE STANDARDS ON MOTION FOR JUDGMENT UNDER FED. R. CIV. P. 52(C) AND FOR *PRIMA FACIE* SHOWING ON TORT CLAIMS

#### A.  Rule 52(C)

As Plaintiff correctly notes, Rule 52(c) provides that this Court may make dispositive findings of fact based on the burden of proof, evidence admitted and the Court's credibility determinations thereof.  *See* Plaintiff's Memorandum in Support of Judgment, ECF No. 235 at 2-3.  More particularly, "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter a judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  *Id.* (quoting Rule 52(c))

#### B.  Tort Claims

As Defendants correctly set forth, the elements of fraud require that they show, by clear and convincing evidence, that: (1) Plaintiff made a false representation to them, (2) with knowledge of its falsity or reckless indifference to its truth, (3) and for the purpose of defrauding Defendants, (4) Defendants justifiably relied on the misrepresentation, and (5) they suffered compensable injury as a result. *See* Defendants' Amended Offer of Proof, ECF No. 222, at 2-3 (citing Hoffman v. Stamper, 385 Md. 1, 28, 867 A.2d 276, 292 (2005)).  As they also correctly set forth, the elements of negligent misrepresentation require them to establish, by a preponderance of the evidence, that: (1) Plaintiff, owing a duty of care to Defendants, negligently asserted a false statement; (2) intending that it would be acted upon by Defendants;

---

be further established at a full trial where the Court hears all the evidence on how 84 Lumber marketed the install program to its customers, including Mortimer").

(3) with knowledge that Defendants would probably rely on the statement, which, if erroneous, would cause loss or injury; (4) Defendants justifiably took action in reliance on the statement; and (5) they suffered damage proximately caused by Plaintiff's negligence. *See* Defendants' Amended Offer of Proof, ECF No. 222, at 3 (citing Lloyd v. Gen. Motors Corp., 397 Md. 108, 135-36, 916 A.2d 257, 273 (2007); White v. Kennedy Krieger Inst., Inc., 221 Md. App. 601, 648, 110 A.3d 724, 751, cert. denied sub nom. White v. Kennedy Krieger Inst., 443 Md. 237, 116 A.3d 476 (2015)). *See also* Plaintiff's Memorandum in Support of Judgment, ECF No. 235, at 3 (Plaintiff's concurring statement that "[i]n the context of their negligent misrepresentation claim, Defendants must establish reasonable reliance by a preponderance of the evidence; . . . in both fraud claims, Defendants must prove reasonable reliance by ***clear and convincing*** evidence") (emphasis in original) (citations omitted).

IV.   **ANALYSIS**

As preface to its analysis of reasonable reliance on alleged misrepresentations, Plaintiff appropriately notes the relevance of both (1) Defendants' extensive business experience in the local construction industry  - over two decades and approximately 200 primarily residential projects, with revenues in excess of $60 million, and millions of dollars in loans from various banks; and (2) Defendants' (a) own inquiry as to construction materials invoicing misbillings/improprieties, and (b) own inquiry and retention of third-party experts/consultants as to construction defects and repair.  *See* ECF No. 235 at 5-7 (citing to specific portions of Mortimer's Bench Trial testimony).  *See also* discussion *supra*, including nn. 4-8, and *infra*.  *Cf.* ECF No. 235 at 10 (quoting Mortimer's testimony that "in construction, there's always issues"); id. (noting that "where the means of knowledge are open and at hand or furnished to the [relying

party] . . . and no effort is made to prevent the [relying party] from using them, and especially where the [relying party] undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the [inducing party]") (quoting *Piper v. Jenkins*, 113 A.2d 919 (Md. 1955)). *See* further discussion, *infra*.

### A. Fraudulent or Negligent Misrepresentations as to Improper Billings under the Commercial Credit Agreement and Plaintiff's Audit

As noted *supra,* Defendants' Second Amended Counterclaim basis for their tort claim(s) on billing misrepresentations are: misrepresenting that (a) improper Commercial Credit Agreement ("CCA") charges made in 2007 by a subsequently-fired Maryland manager were not recurring/would not recur and (b) a Fall 2008 internal audit was conducted and showed no improper CCA charges. *See* ECF No. 44. Defendants cannot maintain a *tort* action requiring reasonable reliance on either misrepresentation where none was justifiable and/or even evidenced.

As noted *supra*, Defendants assert there were misbillings related to construction of Mortimer's Holy Cross residence both leading up to and immediately following the parties' October, 2007 settlement agreement, *i.e.*, prior to entry into the April, 2008 Subcontract Agreement. Their evidence is that Mortimer and his spouse were (a) well-acquainted with the particulars of Plaintiff's CCA invoices over years of extensive business dealings, (b) regularly reviewing those invoices (governed by the parties' 1997 CCA) and identifying erroneous/disputed charges, (c) discussing invoices with Plaintiff's representative(s), and (d) having payments due adjusted.[11] In other words, Defendants were not relying on asserted

---

[11] *See* ECF No. 235 at 8-9 (noting evidence from Bench Trial that Mortimer read and understood 84 Lumber's invoices, met with Plaintiff's manager Uphole to review them and point out misbillings, and negotiated credits on materials); *id.* at 9 (observing that negotiation exhibits an absence of

"misrepresentations"/promises that there would be no further improper CCA charges, but were

independently reviewing and seeking correction of those charges.  This, of course, was not only

Defendants' actual conduct, but the reasonable business conduct of a professional residential or

commercial developer, particularly one of Mortimer's years and extent of experience.  And

Defendants' evidence is that they continued to review their construction materials bills prior to

paying them during 2008 and 2009.[12]  Defendants allege that an increased volume of invoice

documents affected their  ability to "catch mistakes" or alleged deliberate premature or

reliance*); Plaintiff's Reply Brief in Support of Motion, ECF No. 241, at 3 (noting evidence regarding Defendants' familiarity with Plaintiff's invoices, monthly/regular invoicing in the same format over the course of the business relationship, testimony of review by Defendants and/or Mortimer's spouse, and Mortimer's frequent communications/negotiations with Plaintiff regarding billings).

   *See also* ECF No. 235 at 7 ("In the 2008 to 2009 time frame, Mortimer spent between $80,000.00 and $200,000.00 per month at the 84 Lumber store in Oakland, Maryland.") (citing *Trial Transcript Day 1,* pg. 88:7-10); ECF No. 231at 21-22 (Mortimer's trial testimony that as a general contractor he's received probably thousands of material invoices, reviewed them, and was routinely not paying "the amount billed" on statements from Plaintiff because they included billings that were improper); *id.* at 28-29 (testimony acknowledging Mortimer's experience with reviewing invoices and noticing mistakes, and that his ability to catch them varied by number of invoices received that month, *e.g.*, "you should be able to find  mistakes" with 100 invoices "to go through" but "it's much more difficult to determine all the improper invoicing" in a month when you have ordered a lot of materials and have 500 invoices); *id.* at 29 ("So I paid for invoices that I did not see [were] improper at the time."); *id.* at 30-31 (testimony that "[a] lot of times" Mortimer received invoices for work not yet started/completed, which was "easily" seen, and he called Plaintiff to correct/issue credit); *id.* at 29-30 (testimony that Mortimer had meetings with Plaintiff's personnel in various positions, the frequency of which depended on "how bad [Mortimer] complained about particular invoice issues, and that he "always went to the next level" when he "felt [he] wasn't getting an honest response"). *See generally* ECF No. 230 (Mortimer's extensive first day Bench Trial testimony as to billings).

   *Cf.* ECF No. 230 at 53 (trial testimony that following 2007 settlement, Plaintiff told Mortimer he "would not have to spend [his] time or worries on" materials misbillings); *id.* at 79 (testimony that Mortimer's wife "did the billing" and went over the CCA materials statements with him).

[12] *See, e.g.*, ECF No. 230 at 80-81 (Mortimer's testimony that the amounts billed were "never accurate" and he and his wife spent a lot of time deciphering charges and determining what was duly owed for delivered materials, and Mortimer negotiated with Plaintiff "every month" at "the store level" a "credit back [of] improper charges" and "agreement what was to be paid that month").

misbillings.[13] But this simply does *not* turn a breach of contract under the CCA into liability for tortious misrepresentations on which Defendants reasonably relied. Defendants' evidence indicates that they did not (nor could they reasonably have) consider their decade-long CCA business relationship with Plaintiff to have - by contract terms or representations of honest conduct/intent – ever abrogated any further responsibility to engage in their customary billings review. To the contrary, the element of "reasonable reliance" encompasses the essence of its adjective.[14] The Court observes, but does not incorporate as necessary to its holdings, that the record indicates Defendants were making business decisions to continue their relationship with Plaintiff despite awareness of misbillings, and ongoing invoice negotiation and correction issues.[15]

As to the store-wide "broad" audit requested by Mortimer in August, 2008 and conducted by Plaintiff (assertedly improperly), with its outcome reported to Mortimer: the record indicates that

---

[13] *See supra* & n. 11-12 (discussing (a) Defendants' general awareness of the occurrence of mistakes in commercial billings and Defendants' construction business, and corresponding material purchase, expansion and (b) Defendants' specific ongoing materials billing review practices). The Court notes that Defendants apparently elected to continue their own invoice review rather than, *e.g.*, obtain assistance in that aspect of their business expansion. *See, e.g.*, ECF No. 230 at 79 (trial testimony that person in Defendants' organization reviewing the billings was Mortimer's spouse); *id.* at 71 (testimony that Mortimer and his spouse "looked through as much as [they] could" to verify there was no improper billing and they "were very upset" with billings for materials which hadn't yet been supplied, which "happened regularly" and was credited back), *id.* at 90 (testimony that Defendants "expend[ed] company resources attempting to determine whether bills were proper").

[14] The hope and expectation of both parties to business dealings is that they will be dealt with honestly and fairly in accordance with their contractual undertakings; the corollary practice of both parties is that they nonetheless exercise reasonable responsibility in the affairs of their own business enterprises.

[15] *See* ECF No. 231 at 34-35 (testimony that Mortimer continued contractual relationship with Plaintiff while reviewing invoices and communicating/meeting about misbillings because he was busy building and opening a Dairy Queen restaurant business at the same time).

Defendants entered into another Subcontract Agreement on August 25, 2008. This apparently occurred in the interim between Mortimer's (a) independent ongoing awareness of CCA misbillings and monthly negotiations/adjustments, and being told – "during August" by Plaintiff's own employees at Defendants' construction site – of alleged improper materials charges (*see supra*, n. 5); and (b) obtaining, in a September, 2008 meeting, verbal representation of the result of Mortimer's requested "complete audit of the [entire] store".[16] The Court observes that the first Timberlake Subcontract Agreement was executed in April, 2008; construction began in Spring; and Defendants' evidence is of ongoing review and negotiation/credit issuance on invoices. *See generally,* discussion *supra.* It observes Defendants' testimony that the day after he received documentation related to alleged misbillings from Plaintiff's employees at his construction site, Mortimer drove to Pittsburgh and requested a comprehensive inventory and invoicing store-wide audit. See ECF No. 230 at 58-59. That Defendants apparently did not elect to await the results of inquiry arising from information being obtained "during August" and Plaintiff's audit – verbally or in writing - before proceeding to enter the Subcontract Agreement for Timberlake #12 affects the credibility of their assertion that subsequent October, 2008 Subcontract Agreements were entered into in material reliance on audit representations. *Cf.* ECF No. 230 at 151 (testimony that work on 3-4 of the projects was started before the subcontracts were signed); *id.* at 44-45 (discussing approximately month-early start to construction of some Fall 2008 project(s), *e.g.*, Timberlake 11). The Court further notes that despite the audit's

---

[16] *Compare* Defendants' Combined Statement of Material Facts, ECF No. 153, at 12 (asserting that after notice from 84 Lumber employees "[d]uring August", Mortimer met with Plaintiff's representatives "[i]n early September") *with* ECF No. 230 at 58-59, 66 (Mortimer's Bench Trial testimony that he met with Plaintiff's representatives in late September, within a week prior to the September 29, 2008 letter stating Plaintiff had completed an audit of the store from June, 2003 to present).

asserted materiality, Defendants never requested, obtained or reviewed *any* underlying audit result information/data, but received a verbal assurance at a restaurant meeting in September and, on October 1, 2008, a single-page letter.[17]

The Court expressly noted the chronology of their evidence and the apparently-problematic matter of foreknowledge and subcontract execution to this claim, *see supra* (discussing prior Opinions). Yet Defendants have failed to provide any evidence in support of a contrary understanding of the time frame of: Defendants' ongoing invoice-review awareness of misbillings, Mortimer's August on-job-site conversations with Plaintiff's employees regarding misbillings, his contact with Plaintiff's representatives at other location(s), Plaintiff's audit, and Mortimer's meeting to receive oral audit representations in September. To the contrary, Defendants' Bench Trial testimony on this subject omitted evidence of a contrary relevant timing of events. *See generally* ECF No. 230-231.[18]

As with their asserted justifiable/reasonable reliance on Plaintiff's alleged billing misrepresentations, Defendants simply cannot make out reasonable reliance on Plaintiff's alleged audit representations. Defendants (a) had performed, and continued to perform, customary commercial business review of invoices prior to payment, (b) were ongoingly aware of and negotiating correction of misbillings, (c) requested an audit but had not yet obtained/reviewed

---

[17] *See supra*; ECF No. 230 at 72-73 (Mortimer's Bench trial testimony that he "did not get anything on the audit", just the letter); *id.* at 71-72 (testimony that assurance was given at restaurant meeting that "early billing" wouldn't happen anymore).

[18] *See* ECF No. 231 at 37 (testimony that "[w]hen 84 personnel came on the job site and told" Mortimer about issues with billings, he "went to the 84 corporate offices and asked them to conduct an audit", and met to receive the results in September, 2008"); *id.* at 39-41 (testimony that Mortimer relied on representations regarding audit as showing "no improper activity" and again saw premature invoice charges that were, as before, "credit[ed] back" by Plaintiff on complaint, and when Mortimer "didn't reconcile" an invoice he sought resolution with Plaintiff).

any audit information, and (d) continued and expanded their subcontract relationships with Plaintiff. The Court again notes that Defendants indicate their continuation and extension of Subcontractor Agreements was an informed and weighed business decision. For example, Plaintiff's participation was generally advantageous, or even necessary, for Defendants to obtain/ensure bank financing for their expanding construction projects. Moreover, Defendants testified that Plaintiff's involvement was essential to a bank's offering/approving Defendants' take-over of construction on the bank-foreclosed Cedar Creek project. *See generally* ECF No. 230-231 (Mortimer's Bench Trial testimony); ECF No. 230 at 35 (testimony that bank approved Cedar Creek loan package, when Defendants had numerous other projects, on basis of subcontracts with Plaintiff).

In sum, Defendants have failed to make a sufficient showing - under the applicable standards for either fraudulent or negligent misrepresentation - that they justifiably relied on alleged misrepresentations regarding misbillings or audit results. *See* Plaintiff's Brief in Support, ECF No. 235, at 3, n. 4 (observing that "[a]mong the five elements of negligent misrepresentation is that a plaintiff must show she justifiably takes action in reliance on the statement") (quoting *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631 (Md. App. 2012)); *id.* at n. 5 ("To recover on a claim for fraud, including fraud in the inducement, a plaintiff must show, *inter alia* that she not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and would not have done the thing from which the injury had resulted had not such misrepresentation been made.") (quoting *Parker v. Columbia Bank*, 604 A.2d 521 (Md. App. 1992)); *id.* at 10 ("[W]here the means of knowledge are open and at hand or furnished to the [relying party] . . . and no effort is made to prevent the [relying party] from using them, and especially where the [relying party] undertakes examination for himself, he will not be heard to say that he has been deceived to

his injury by the misrepresentations of the [inducing party].") (quoting *Piper v. Jenkins*, 113 A.2d 919 (Md. 1955)).

### B.   Fraudulent or Negligent Misrepresentations as to Use of Skilled Crews as Part of National Install Program; New Theories of Misrepresentations Based on Failure to Supervise the Job Site

Defendants appear to now abandon their claim of misrepresentation premised until quite recently on performance of the contracted work by "friends and family" rather than subcontractors who were part of an 84 Lumber National Install Program.  *See* Defendants' Memorandum of Law in Support of Opposition, ECF No. 238 (omitting any argument on this claim); *id.* at 6 (acknowledging Mortimer's testimony that he visited job site and recognized local subcontractors, and stating "Court noted that this testimony effectively foreclosed any claim Mortimer might have that he relied on representations that 84 Lumber would use a national team of installers"). This adjustment in their litigation position is prudent given the record.

As this Court has previously observed in Opinions and Plaintiff largely correctly reiterates in the Memorandum in Support of its pending Motion: (1) with the exception of enumerated specifications as to decking (requiring "trained and experienced personnel"), the Subcontract Agreements contain no language specifying composition of the workforce; and (2) Mortimer was personally aware of subcontractors who would be and/or were working under the Subcontract Agreements prior to/or shortly after execution of each (between April and October, 2008).  *See* ECF No. 235 at 13.

Plaintiff well-presents the analysis of the effect of the parties' contract language with citations to this Court's prior Opinions (including the Damage Limitations Memorandum, ECF No. 214, and Memorandum Opinion on the Parties' Multiple Motions and Cross-Motions for Summary Judgment, ECF No. 166), the evidence and case law.  *See* ECF No. 235 at 14-17

17

(explaining that written contract terms (and, alternatively silence/absence as to alleged material misrepresentations) are relevant to reasonableness of reliance) (citations omitted).  *See also Central Truck Ctr., Inc. v. Central GMC, Inc.*, 4 A.3d 515 (Md. App. 2010).[19]

Similarly, Plaintiff provides an apt analysis of the evidence and the law as to the timing and extent of Defendants' knowledge of the subcontractors employed.  *See* ECF No. 235 at 10 ("Evidence presented at trial revealed Mortimer was far from an absentee general contractor."); i*d.* at 11 ("Mortimer was involved in the projects and was present at the job sites to witness work by subcontractors he knew . . . .") (quoting Mortimer's testimony that prior to signing August [and subsequent] Subcontract Agreements, he observed local subcontractors who worked on his prior residential construction projects now working at the Subcontract construction site); ECF No. 231 at 5 (Mortimer's testimony that "I actually preferred they used local that were qualified because we are a small community. So, anything we could keep business-wise in the community was very fair to me, I preferred that, as long as they were vetted and qualified with proper

---

[19] The Court again observes, as does Plaintiff, that the Subcontracts contain no specifications for the workforce as to other components of the subcontracted work, *e.g.* framing, windows and doors, roofing, and siding and exterior trim.  *Cf.* ECF No. 231 at 10 (Mortimer's testimony that he could have added language regarding subcontract work performance by a National Install contractors program had he chosen, but that Plaintiff's status as a national company comprised "the backing [he] needed to get [the] assurances to sign [the April, 2008] contract").

Nor do they contain any provisions regarding individual subcontractor's licensing/insurance – a late-raised theory of (a) first breach of contract and (b) then tort liability, which Plaintiff factually disputes, and which is irrelevant.  Defendants have neither (a) proffered evidence of any individual subcontractor's breach of professional licensing/insurance or any harm caused to them thereby, nor (b) pursued licensing/insurance as a basis of tort liability in their post-Bench Trial pleadings.  *See* ECF No. 235 at 15-16; ECF No. 231 at 16-18 (Mortimer's testimony that he had no knowledge/indication of whether subcontractors (as opposed to Plaintiff) were insured or if they were "vetted" by Plaintiff).  *Cf.* ECF No. 235 at 16, n. 11 (Plaintiff's attestation of requirements for subcontractor's employment by 84 Lumber).  *See generally* Defendants' Memorandum in Support of Opposition, ECF No. 238.

licenses and insurance.").[20]  Defendants' testimony thus indicates they considered the alleged workforce representations related to the contractual guarantee of work product standards, and not as material representations of national/non-local subcontractors.  *See also supra* n. 8 (quoting Defendants' Amended Pretrial Statement, ECF No. 224, stating, as to the "material facts to be offered at trial": "In 2008, 84 Lumber convinced Mortimer to use its installed sales program by representing it had qualified and skilled construction workers to perform the work.");  ECF No. 231 at 13 (Mortimer's testimony that if he were unhappy with the personally-observed subcontract workforce, he could have raised it with Plaintiff then (*i.e.*, in the early months of initial construction), and would have had he been aware of any construction issues).

Nor can Defendants' comparatively-recent allegations of Plaintiff's failure to supervise - presented both as breach of contract, *see supra*, and as an alternative tort claim - avail them in opposition to Plaintiff's motion.  The Court notes, as in its Memorandum Opinion on Defendants' Motion to Reconsider, ECF No. 236, serious considerations of waiver as to new allegations and theories of liability in an almost six (6) year old litigation.  *See* ECF No. 236 at 9-10.  Moreover, Defendants' repeated assertions of the breach of contract nature of their new claims regarding Plaintiff's supervisory obligations raise considerations of estoppel as well. *See* discussion, *supra*.

---

[20]  *See also* ECF No. 231 at 10-12 (Mortimer's testimony that during the first months of construction at Timberlake, he stopped by and drove by, was ensuring that materials were in order, spoke to a subcontractor whom he had previously directly employed, and sometimes swept up/cleaned the work site); *id.* at 13-15 (Mortimer's testimony that he was aware of the subcontract work force before entering the August, 2008 contract and observed "to a large extent" the subcontractors on those additional projects before entering the October, 2008 contracts).

Even momentarily setting aside the likely applicability of waiver and/or estoppel, and considering this asserted tort claim, the Court finds it subject to a ruling in Plaintiff's favor:

Defendants contradict their own assertions regarding Plaintiff's representations of supervisory responsibility. More specifically, Mortimer himself presented somewhat conflicting testimony regarding whether Plaintiff represented that it was assuming supervision of the entire construction site (as, *e.g*, a "project manager") or supervision of its own Subcontract Agreement workforce (by, *i.e.*, a "site superintendent" as referenced in the parties' contracts). *See* ECF No. 230 at 32 (Mortimer's testimony that he doesn't recall if Guthrie ever said Mortimer "didn't need to hire a project manager when [he] used [the] Install Program", but "talked to" Mortimer about having freedom); *id.* at 28-29 (testimony that Plaintiff represented Mortimer could save the expense of a project manager and could focus on other projects)[21]; *id.* at 49-50 (testimony that Plaintiff specifically represented to Mortimer during the "early 2008 timeframe" that Guthrie "was going to manage these projects" and Defendants only learned during Guthrie's deposition that he did not); *id.* at 49 (testimony that Guthrie only came when Mortimer raised issues with leaks at units).

The evidence indicates that Plaintiff was supervising its own subcontractors (many of whom were known to, some of whom were previously directly employed by, Defendants). Defendants' own evidence indicates that Mortimer was present at/visited the construction sites and observed the workforce (including those known to him from direct-hire on prior projects and his long construction dealings in the local community). It also indicates Mortimer interacted with

---

[21] *Cf.* Plaintiff's Reply to Defendants' Brief in Opposition, ECF No. 241, at 5 (asserting that any alleged supervision misrepresentations were too vague and/or general to justify reliance asserted, and that Mortimer did not discuss the details of site supervision with 84 Lumber) (citing *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404 (Md. App. 2003)).

Plaintiff's designated supervisor Gary Uphold (with whom Mortimer had a long acquaintance) and other individuals/employees on location (who were, by Defendants' assertions, speaking directly to Mortimer regarding alleged construction materials misbillings and construction defects). *See e.g.,* discussions of Defendants' evidence regarding construction sites, *supra*; ECF No. 231 at 19-20 (Mortimer's testimony that during initial project construction and Summer, 2008, he was in contact with Gary Uphole and called him "I don't know how many times a week").[22] *See also* ECF. No. 231 at 116 (Uphold's trial testimony that during Plaintiff's "subcontract scope of work" , Uphold was at both Timberlake and Cedar Creek once or twice daily "to observe and supervise the subcontractor work").[23]

To the extent Defendants' "national install program" tort claim could now be recognized as a "failure to supervise *the project site*" tort claim, Defendants fail to make sufficient showing of the requisite element of reasonable reliance. First, the evidence demonstrates Mortimer's extensive construction experience in the community, presence on the project sites, familiarity and indeed interaction with at least some number of subcontractor workers, knowledge of and

---

[22] *Cf. supra* at n. 3 (citing Defendants' Combined Statement of Material Facts, ECF No. 153 (asserting material breach of contracts "by failing to provide competent supervision as required by General Condition 1")).

[23] *Cf.* Plaintiffs' Memo in Support, ECF No. 235, at 12-13 ("It should have been apparent to Mortimer—a twenty-year veteran of the construction industry—whether and to what extent the project sites were supervised and the quality of the workforce. Therefore, reliance on 84 Lumber's alleged misrepresentations is unreasonable, and Mortimer cannot now say that he was deceived."); Plaintiff's Reply to Defendants' Brief in Opposition, ECF No. 241 at 3 ("Defendants did not rely, they independently verified and assented.").

The Court concurs with Plaintiff's observation that *Gross v. Sussex Inc.*, 630 A.2d 1156 (Md. 1993), is inapposite. *See id.* (disputing Defendants' assertion that *Gross*, in which a real estate agent was found to have reasonably relied on the developer's misrepresentations that proper permits had been obtain, supports a finding of reasonable reliance by Defendants on alleged misrepresentations regarding site supervision).

contact over the extended construction periods with Uphold as site superintendent of the

subcontract work, and simultaneous absence of contact with Guthrie despite Plaintiff's purported

express representation that he would be managing the projects.  Second, the actual contract terms

are again relevant to Defendants' reasonable reliance.  The negotiated terms indicate Plaintiff's

responsibility to supervise its own subcontract workers but do not provide that Plaintiff was also

assuming the usual general contractor's role as project manager.  Nor do the Subcontract

Agreements exempt Mortimer from any responsibility for the construction sites other than/until

final "punch list"/walk through.  To the contrary, they provide in relevant part:

> General Conditions
>
> 1. *The Subcontractor shall furnish* all labor, material equipment, taxes, insurance, dues, contributions, services, and all other incidentals, including but not limited to, *competent supervision*, and tools *as are necessary for proper performance of the Subcontract work* described in this agreement . . .
> ****
> 6.  The Subcontractor and Contract will walk the job together and perform a final inspection of the work.
> 7.  Subcontractor will complete all punch list items provided at final walk through.
> ****
> 12.  Contractor shall only communicate with 84 Lumber's *site superintendent*, and not give instructions or orders directly to 84's laborers or Subcontractors.
> 13.  *Contractor is responsible for coordination of the site, schedule, materials storage and other trades work*.
> ****
> 15.  84 guarantees that the Work performed hereunder will conform to the specifications, complies [*sic*] with all Laws, and will be free from defects in workmanship and materials. . . .

*See, e.g.,* ECF No. 230, Bench Trial Joint Exhibits, J2-7 (Subcontractor Agreements) (emphasis

added).  *See also* Plaintiff's Reply to Defendants' Brief in Opposition, ECF No. 241, at 4 ("It is

beyond comprehension that a general contractor in the industry for over two decades believes his

sole responsibility on a multi-million dollar project is to do a final walk-trough. As the

Agreements suggest, a general contractor has more duties."); *id.* (noting that Subcontract

Paragraph 13 provides Mortimer was "responsible for coordination of the site, schedule,

materials storage, and other trades work. . . . The Agreements require Mortimer be a general

contractor, not a customer waiting for a finished product.") (citing Bench Trial *Exs. J2-J7).*[24]

## C. Fraudulent Misrepresentations as to Repair of Construction Defects

As discussed at the outset of this Opinion, Defendants' Second Amended Counterclaim, ECF

No. 44, alleged fraud/intentional misrepresentation/concealment expressly with regard to

Summer, 2009 representations to Mortimer regarding faulty construction issues  and Plaintiff's

intent to correct/purported correction of them.  *See supra* at 4.  *See also id.* at n. 4 (quoting

Defendants' Combined Statement of Material Facts, ECF No. 153, at 20 (stating that in Spring

and Summer 2009, Mortimer received "numerous reports of leaks at units at both Timberlake

and Cedar Creek" and notified 84 Lumber, and that Mortimer  "retained multiple engineers and

---

[24] Defendants' comparatively recent characterizations of misrepresentations by Plaintiff include that its "Install Program" was a "turnkey program" in which Plaintiff "would provide the supervision" and Mortimer "did not need to have a role in the construction".  *See* ECF No. 230 at 6-7.  Defendant's Bench Trial evidence appeared more generally directed to further development of an analogy to Waters v. Massey-Ferguson, Inc., 775 F.2d 587 (4th Cir. 1985).  *See generally* ECF No. 230-231; *see, e.g.,* ECF No. 230 at 29 (testimony that Mortimer was excited to work with national company which had ability to get work done right and, if it wasn't, "to fix it" (rather than Mortimer's having to "use [his] own resources" to do so); 32 (testimony that Plaintiff was promoting a "unique" product); 33 (testimony that the Install Program "was a product"; "[t]hat's kind of how they pitched it").

The Court therefore pauses to direct Defendants to its prior analysis of an asserted analogy to *Waters*. *See, e.g.,* Damage Limitations Opinion, ECF No. 214, at 12.  It further observes that the Massey-Ferguson factory-made tractor – a self-contained complex product - was under the exclusive control of the defendant as to both initial and re-manufacture; there was no role for the purchaser.  The factual circumstances of the case *sub judice*, as discussed extensively during this litigation - including the communications and interactions between Plaintiff, Defendants, and their employees and consultants - are simply not analogous.

construction professionals to investigate the issues", made written demands for repair and 84 Lumber "repeatedly represented that [it] would correct all construction defects"); *id.* at 21 (recounting that in August through mid- September, 2009 84 Lumber retained other construction contractors to investigate and repair the defects and falsely represented they were corrected)).

As Plaintiff has observed, Defendants' independent investigations of the construction defects, and communication/consultations with Plaintiff's representatives at various levels regarding the causes, remedies and attempts at repair, are significant to the element of reasonable reliance. *See* ECF. No. 235 at 10 (noting that under Maryland law where one "undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations . . . .") (quoting *Piper v. Jenkins*, 113 A.2d 919 (Md. 1955)).

It is beyond possibility that Defendants reasonably relied on "misrepresentations" about the existence and remediation of construction issues, such as leaks, where: (a) Mortimer personally observed or was notified by site workers of defects and was actively engaged in ongoing communication with Plaintiff regarding particular defects; (b) Defendants and Plaintiff were on site and repairs were attempted; and (c) both parties brought in inside and/or outside counsultants/experts, and discussed possible sources of the construction problems (*e.g.*, materials vs. installation). *See, e.g.,* ECF No. 231 at 46-47, 52 (Mortimer's testimony recounting communications with Plaintiff beginning when leaks occurred (which he first observed in Spring, 2009), that Plaintiff "brought some people in" and "they were trying to fix it" over a period of 18-20 months); *id.* ("They brought in other contractors. So there were multiple different people they brought in to fix these problems."); *id.* at 47 (testifying, as to recurrence of leaks, that "when we saw the leaking [perhaps "a few months" after Plaintiff said it was fixed], we would notify the store . . . and they would come in and address those issues); *id.* at 47-50

(testimony that "in many instances" Plaintiff undertook repair endeavors it promised and that it brought in consultants and engineers with regard to construction problems); *id.* at 53-54 (Mortimer's testimony that he "didn't just rely on" Plaintiff but "allowed" Plaintiff's "store level" employees a "reasonable amount of time", *i.e.*, a "couple months" and "a couple times" to repair leaks and, "when they couldn't fix them", Mortimer "went up [with Plaintiff's higher-level employee(s)] to several different crews to try to fix these leaks through a period of time"); *id.* at 54-55 (testimony that during Spring and Summer 2009 Mortimer promptly reported leaks he observed and was given repeated assurances that Plaintiff would bring in proper professionals to fix them); *id.* at 58 (recounting, as an example, leak that could have been installation or manufacturing problem, in which "everyone thought it was the doors at the time" so Plaintiff "brought the door company out"); *id.* at 62-63 (testifying that Mortimer had two independent inspections/observations done "by professional experts" and provided report(s) to Plaintiff).

The Court observes Defendants' express testimony that Plaintiff made ongoing attempts at repair, and that Defendants and Plaintiff were undertaking independent inquiry and exchanging information. *See, e.g.*, ECF No. 230, Defendants' Ex. G (Defendants' August 28, 2009 "breach of contract" letter to Plaintiff documenting construction defects and attaching independent inspect report/recommendations of Highland Engineering); *id.* Defendants' Ex. J (Defendants' email of January 28, 2009 attaching an independent inspection report from Megco Inspections); *id.* at 154 (Mortimer's testimony that he immediately provided his reports from independent investigations of defects to Plaintiff to "just kind of help out and give direction and try to fix these problems"). Plaintiff's alleged – and substantially evidenced - protracted failure to successfully repair construction defects to the standard guaranteed under the Subcontract

Agreements' Paragraph 15 gives rise to liability for breach of contract;[25] but it does not in the circumstances of record give rise to a tort of misrepresentation as to which Defendants have sufficiently shown the requisite element of reasonable reliance.[26]

## V.     **CONCLUSION**

In the end, although there is substantial evidence that Plaintiff's performance of its contractual undertakings was lacking, nothing in this record can serve to convert Plaintiff's

---

[25] Thus, this ruling on tort claims does not leave Defendants without a meaningful remedy. Both parties have acknowledged that the cost of bringing the projects into conformity with warranted standards is substantial.  Moreover, an alternative measure of damages from breach of a warranty concerning the standard of promised contract performance, including construction, is the difference in fair market value on the contemplated date between the performance as warranted and as delivered.  *Cf., e.g.*, ECF No. 230 at 95 (Mortimer's testimony that he could not meet delivery commitments under other contracts owing to Plaintiff's delays in remediating subcontract work defects).

[26] *Compare* Defendants' Sur-Reply in Support of Opposition, ECF N. 244, at 1 (citing Lawley v. Northam, 2011 WL 6013279 (D. Md.  Dec. 1, 2011)).  This case, cited by Defendants for the proposition that " home purchasers could rely on a seller's representations regarding defects in the home even when they retained a professional inspector to evaluate the defects" is patently distinguishable.  It denied in part a motion for summary judgment, in a *home purchaser*'s suit including claims of fraudulent inducement/concealment and negligent misrepresentation, where defendant vendors, agents, and brokers were aware at the time of sale that defects in the home could harm its occupants.  They had been instructed by the County agency to correct the property's mold, lead paint, and water nitrates problems prior to occupancy. And the disclosure statute required the vendor to disclose latent defects that would pose direct threats to the health or safety of the purchaser/occupant.   The passage cited refers to disputes of material fact as to the extent of information observable and/or obtained from the pre-purchase "home inspection".  This was contrasted to more extensive home conditions of which evidence indicated defendants were aware and plaintiffs were not (*e.g.* their knowledge that the home had a water filtration system did not resolve defendants' duty to disclose water nitrate levels; the inspector's notation of "moderate" basement mold and damp conditions did not constitute notice of alleged recurrent black mold  conditions in upper living area or house-wide contamination). The passage primarily presents an extended analogy to *Gross, supra,* in emphasizing that where the defects litigated were not so obvious as to conclusively make reliance on representations to their contrary unreasonable (and plaintiffs' customary, limited independent pre-purchase home inspection did not reveal them), defendants were not entitled to summary judgment.

substandard construction, however substantial, from breach of contract into a tort of misrepresentation. To the contrary, the evidence indicates that Defendants, sophisticated developers, knew - throughout their relevant contractual relationships with Plaintiff - what they were getting and indeed took care to know. Defendants were undoubtedly disappointed in their hopes; but as to what has been sufficiently supported in the record, they were not misled. Rather than relying uncritically on Plaintiffs' statements, communications, and reports, Defendants made business decisions informed by their own factual reviews and investigations.

For the reasons set forth in this Opinion above, the Court will grant Plaintiff's Motion for Judgment on Defendants' Tort Counterclaims , ECF No. 234, requesting judgment on Counts I through III of Defendants' Second Amended Counterclaim, ECF No. 44. Order to follow.

Lisa Pupo Lenihan
United States Magistrate Judge

Dated: February 23, 2017

cc: All counsel of record